# ULLMAN et al., Appellants, v. ST. LOUIS FAIR ASSOCIATION.

## Division Two, February 25, 1902.

1. **Contract:** EXCLUSIVE PRIVILEGES FOR CERTAIN TIME: LEASE: BETTING ON HORSE RACE: GAMBLING. A fair association by its contract agreed, for a consideration of $90,000, to be paid in certain installments, to sell and did sell to plaintiffs the exclusive betting and book-making privileges on its race track for a certain meeting to last 49 days. The first three installments, amounting to $36,000, were paid, and a disagreement arising between them and the association, plaintiffs abandoned their privileges after twelve days, and sued for over thirteen thousand dollars as excess of payments. *Held*, that this agreement, as it concerned no interest in the realty, was not a lease, and therefore furnished no basis for payment in proportion to the number of days the privileges were actually enjoyed, in accordance with the principles governing leases.

2. **Gambling Contract:** FOR BETTING AND POOL-SELLING ON RACE COURSE. A contract which by its terms sells to certain persons the exclusive privileges of betting and book-making on a race course, is a contract for gambling with the public, and being such, the courts will not aid either party thereto in its enforcement.

3. ———: EXECUTORY: IN PARI DELICTO. Where both parties to a gambling contract are *in pari delicto*, the courts will not aid either to undo that which has already been done in compliance therewith, nor to recover money paid in part performance thereof.

4. ———: ———: PART PERFORMANCE. It is only where the gambling contract remains wholly unexecuted on one side and where by its abandonment the act which the law forbids will be averted, that the courts permit a recovery of money paid on the ground that the contract is still executory. So that, in this case, where the agreement gave plaintiffs the exclusive privilege of betting and book-making on a race course, for forty-nine days, for $90,000, to be paid in installments of $18,000 cash and $9,000 every week thereafter, and after a payment of $36,000, and the enjoyment by plaintiffs of the privilege for twelve days, disagreements arose between them and the defendant

Vol 167 mo—18

fair association, and then, because of interference with their enjoyment thereof by defendant the profits became so small that they abandoned the same, the courts will not permit them to recover any part of the money by them paid, whether there was an overpayment according to the terms of the contract or not.

Appeal from St. Louis City Circuit Court.—*Hon. Franklin Ferris*, Judge.

AFFIRMED.

*Judson & Green* and *G. L. Stern* for appellants.

(1) The contract here in question is essentially a contract of lease, whereby certain premises were let by defendant to plaintiffs for the purpose of having plaintiffs occupy the same and exercise certain exclusive privileges thereon for a period of forty-nine days, at a rental price of $90,000. And upon the unlawful interference by defendant with plaintiffs' occupation and use of said premises and privileges, plaintiffs had a right to abandon said contract and to surrender possession of the premises to defendant. O'Neill v. Manget, 44 Mo. App. 280; Jackson v. Eddy, 12 Mo. 210; Murphy v. St. Louis, 8 Mo. App. 482; Bishop on Contracts, sec. 828; Leadbeater v. Roth, 25 Ill. 587. (2) This leasing contract having been rightfully abandoned, and possession of premises having been surrendered by plaintiffs to defendant, on account of the unlawful interference by defendant with plaintiffs' use and occupation thereof, and with their exercise thereon of the privileges granted by said contract, defendant is entitled to retain only such part of the $36,000 paid by plaintiffs as is a proportionate rental of said premises for the twelve days they were actually occupied by plaintiffs, because the contract is divisible and the rent is apportionable. Stevenson v. Hancock, 72 Mo. 612; Prior v. Kiso, 81 Mo. 241; Biddle v. Hussmann, 23 Mo. 597; Carter v. Burr, 39 Barb. (N. Y.) 59; Wood on Landlord and Tenant (2 Ed.), p. 1109. (3) Plaintiffs are not seeking in

this action to enforce this contract, or to recover damages for its breach; and granting, for sake of argument, that the contract is against public policy and therefore illegal, yet as plaintiffs have rescinded and abandoned the contract, they are entitled to recover the excess payments made to defendant amounting to $13,959.19, because the contract is apportionable, and, for its unperformed period, is executory and not executed, and it would be inequitable and unconscionable for defendant to retain said excess payment after forcing plaintiffs to abandon the contract. Wiggins Ferry Co. v. Railroad, 73 Mo. 411; Adams Express Co. v. Reno, 48 Mo. 264; Hatch v. Hanson, 46 Mo. App. 323; Cahn v. Rinker, 44 Fed. 472; Tracy v. Chinn, 79 Mo. App. 648; Brooks v. Martin, 2 Wall. 70; Bank v. Bank, 16 Wall. 483; Spring Co. v. Knowlton, 103 U. S. 49; 2 Comyn on Contracts, 361; Jenkins v. Ins. Co., 79 Mo. App. 65; Skinner v. Henderson, 10 Mo. 205; White v. Bank, 22 Pick. 181. (4) Even if the contract is illegal, plaintiffs should recover, because the public policy of this State, as declared by its statutes, encourages the abandonment of illegal contracts, by permitting the parties thereto to rescind them, and to recover the amount paid thereunder at any time before they are completely executed. R. S. 1899, sec. 3431; Weaver v. Harlan, 48 Mo. App. 319; Skinner v. Henderson, 10 Mo. 205.

*Valle Reyburn* for respondent.

(1) The subject of the contract was betting on horse races, which is an unlawful consideration, against public policy, the contract therefore invalid, and no rights thereunder will be recognized or enforced in any court. St. Louis Fair Association v. Carmody, 151 Mo. 566; Sprague v. Rooney, 104 Mo. 349; Hayden v. Little, 35 Mo. 418; Shropshire v. Glascock, 4 Mo. 536; State v. Burgdoerfer, 107 Mo. 22; Roselle v. Farmers Bank, 141 Mo. 36; 1 Pomeroy, Eq., sec. 402, p.

547; 2 Pomeroy, Eq., sec. 940, p. 1350; Adams' Eq. (8 Ed.), pp. 174, 175; 1 Story's Eq., pp. 301, 307, 309. (2) Where an unlawful contract has been put in course of execution, the legal rights and remedies of both parties thereto are measured in same manner as if the agreement condemned by law had been fully effected and the courts will refuse their assistance to either party. Hooker v. De Palos, 28 Ohio St. 257; Skinner v. Henderson, 10 Mo. 205; Adams Express Co. v. Reno, 48 Mo. 264; Shaffner v. Pinchback, 133 Ill. 410; In re Great Britain, etc., Co., 26 Ch. Div. 616; Herman v. Jenchner, 15 Q. B. 561; Story, Contracts (5 Ed.), sec. 617; 2 Parsons, Contracts (7 Ed.), p. 746. (3) To constitute a contract severable or divisible, the part to be performed by one party must consist of distinct items, and the price to be paid by the other party apportioned to each item, and a single or entire contract, even where the contract price is payable in installments, is not apportionable. 2 Parsons on Contracts (8 Ed.), p. 517-520; Huyett, etc., Co. v. Chicago, etc., Co., 59 Am. St. Rep. 272; Norrington v. Wright, 115 U. S. 188.

GANTT, J.—The defendant on and prior to May 1, 1896, was a corporation and was the owner and in possession of a race track, with stands and grounds for spectators, a club-house and betting ring with stalls and conveniences for "pool-selling" and "book-making," all inclosed, to which the public were admitted during the racing season on payment of an admission fee.

On the first day of May, 1896, the defendant through its officers made and entered into the following contract with the firm of Alex. Ullman & Company, composed of Alexander Ullman and Edward W. Sinclair:

"This agreement, made and entered into, this first day of May, 1896, by and between the St. Louis Fair Association, a corporation created and existing under the laws of the State of Missouri, party of the first part, and Messrs. Alex. Ullman &

Company, of St. Louis, Missouri, party of the second part, witnesseth:

"That said party of the first part does hereby sell and convey to the said party of the second part the exclusive betting and book-making privileges, including also auction, official pool-selling, water, calling and form-book privileges on its race track in the city of St. Louis, during the ensuing race meeting, which will begin on Saturday, May 9, 1896, Sundays excepted, for forty-nine days, until and including the fourth day of July, 1896. Said meeting is to be conducted in every feature and particular in accordance with and subject to the rules and regulations of the American Turf Congress, of which it is a member.

"It is agreed and understood that the party of the second part will allow any reputable book-maker so desiring to operate on said track under the regulations enforced by the party of the second part.

"For the above enumerated exclusive betting, official pool-selling, water, calling and form-book privileges on said track during said meeting, the said party of the second part hereby covenants and agrees to pay to the said party of the first part the sum of ninety thousand dollars, payable in installments, as follows, to-wit:

"Eighteen thousand dollars in hand, paid on entering into this agreement, the receipt of which is hereby acknowledged. The further sum of seventy-two thousand dollars is to be paid on the dates, and in the sums, hereinafter immediately set forth, to-wit:

"On Saturday, May  9, 1896, nine thousand dollars.
"On Thursday, May 14, 1896, nine thousand dollars.
"On Thursday, May 21, 1896, nine thousand dollars.
"On Thursday, May 28, 1896, nine thousand dollars.
"On Thursday, June 4, 1896, nine thousand dallars.
"On Thursday, June 11, 1896, nine thousand dollars.
"On Thursday, June 18, 1896, nine thousand dollars.

"On Thursday, June 25, 1896, four thousand five hundred dollars.

"On Thursday, July 2, 1896, four thousand five hundred dollars.

"The said party of the first part agrees to furnish said party of the second part the necessary tickets of admission to said track for all employees engaged by said party of the second part, or required by him to properly conduct and operate the auction mutual system of betting of said track during said race meeting.

"And the party of the first part also agrees to furnish said party of the second part five daily tickets for admission to said course, for each betting book employed in recording and making bets on said course, or at the election of the said party of the first part, to allow a credit of five dollars per day for each book employed on said course in lieu of said five tickets or daily admissions."

Ullman & Company paid the cash payment of eighteen thousand dollars stipulated, and began and enjoyed the rights thereby secured, and paid the first two weekly installments, to-wit, nine thousand dollars on May 9th, and a like sum on May 14th.

Plaintiffs did not themselves make wagers or directly and personally conduct the betting on races run at defendant's track but farmed out the betting monopolies to professional operators, known in race-track parlance as book-makers, who each paid plaintiffs for the privilege to make wagers on the races with the attending public, one hundred dollars a day, which seems to have been the customary price on that track for several years previous to that season.

From plaintiff Ullman's testimony it appears the business was very dull and only about one-half of the usual number of book-makers applied for the privilege, and as plaintiffs' means of making themselves whole on their contract with defendant depended on the book-makers, plaintiffs determined to increase

the assessment upon the book-makers to make up for the loss in numbers and gave and posted a notice to that effect, and thereupon the following correspondence ensued:

"St. Louis, May 16, 1896.
"Messrs. Alex. Ullman & Co., City.

"Gentlemen: We are advised that you have posted the following notice, to-wit: 'Book-makers wishing to draw in for the next three days can do so by paying their pro rata of $1,600 per day for five races in case books average less than 16. Closes at 1:45 p. m.'

"Your contract with this association does not justify you in making such a rule. It is not in accord with custom and is unreasonable. I am instructed to advise you that it is the view of this association that any reputable book-maker shall be permitted for the consideration of $100 per day, as usual, to sell pools subject to such reasonable rules as to mode of selling and such as are customary as you may prescribe.

"If you persist in the course which the association has condemned and thinks unwarranted, it will exercise the authority to grant to reputable book-makers the right to conduct business at the association grounds without your consent.

"Very truly yours,
"St. Louis Fair Association,
"C. C. Maffit, President."

"St. Louis, Mo., May 16, 1896.
"St. Louis Fair Association,
"C. C. Maffit, Esq., President, City.

"Gentlemen: We beg leave to acknowledge receipt of your communication of even date relative to the book-making privileges at the St. Louis Fair Association race meeting of 1896, and in reply permit us to say that we are merely pursuing our rights under the contract between your association

and ourselves, and we must insist on our right to prescribe the terms upon which any reputable book-maker shall do business in the ring during the life of said contract.

"We deny the right of the association to allow anyone to carry on business in the ring without our consent, and beg leave to notify your association that we will resist to the utmost any attempt on the part of your association to interfere with us in this or any other particular, or with our conduct under the terms of said contract.

> "Respectfully,
>
> "ALEX. ULLMAN & Co."

On May 18, 1896, plaintiffs filed their application for a temporary injunction against defendant to enjoin it from placing or permitting book-makers on said track without consent of plaintiffs, which was subsequently denied by the circuit court.

Plaintiffs continued to exercise their privileges of selling rights to make books and wagers on said track until May 23, 1896, but refused on May 21, 1896, to pay the installment of $9,000 due by their contract on that date.

On May 23, 1896, they abandoned the further enjoyment of their privileges under their contract and afterwards on the tenth of September, 1896, began this action, in which after pleading said written contract and alleging that defendant sold to plaintiffs the exclusive betting and book-making privileges mentioned therein, they made the following averments:

"Plaintiffs state that they had in all things complied with the terms and conditions of said contract on their part to be performed, and that they had paid to defendant such sums as fell due under said contract to-wit, $18,000 on May 1, 1896; $9,000 on May 9, 1896, and $9,000 on May 14, 1896, and were ready and willing to pay the remaining installments in the amounts named in said contract and on the terms therein specified.

"Plaintiffs state that notwithstanding the promises, the payments of said installments, and their readiness to perform the contract on their part, defendant refused to permit plaintiffs to exercise said rights and privileges secured to them by said contract, and insisted on controlling and fixing the terms of compensation for which privileges shall be sublet by plaintiffs, and refused to permit plaintiffs to continue in their exclusive privileges secured by said contract, so that on May 23, 1896, plaintiffs were compelled by this illegal interference of defendant to abandon, and did abandon, the performance of said contract. Plaintiffs aver that this interference by defendant with plaintiffs' rights under their contract was wholly illegal; that by reason thereof plaintiffs were compelled to abandon the performance of said contract.

"Plaintiffs aver that they exercised the privileges and franchises secured to them by said contract only for the term of twelve days, and at the rate of consideration therefor fixed by said contract there was due defendant therefor, to-wit, for said term of twelve days, only the sum of $22,040.81 out of the $36,000 paid by plaintiffs to defendant.

"Wherefore, plaintiffs state that they have paid to defendant the sum of $13,959.19 in excess of the sum under said contract for the time they, said plaintiffs, were permitted by defendant to exercise and enjoy the rights and franchises secured to plaintiffs by their said contract and this excess so paid is justly due from defendant to plaintiffs and defendant insists on retaining said excess payments and refuses to repay the same or any part thereof, though demanded by plaintiffs. Wherefore plaintiffs pray judgment for $13,959.19, with interest and costs."

In its answer defendant pleaded the contract *in haec verba* and alleged that it believed this was the same contract described and referred to in plaintiffs' petition and alleged that it did not contract with plaintiffs otherwise than therein set forth. Denied that plaintiffs did in all things comply with

their contract, but on the contrary failed and refused to do so. Admitted that plaintiffs paid it $36,000 including the install-ment due May 15, 1896, but averred that they failed and re-fused to pay the installment of $9,000 due May 21, 1896. Denied that the contract fixed any rate per day for the priv-ileges which it sold plaintiffs, and denies that plaintiffs only owed it $22,040.81 for twelve days, but alleges that by the said contract there was then due defendant $36,000 for the time during which plaintiffs exercised the privileges conferred on them.   Denied plaintiffs paid the defendant $13,959.19 in excess of the sum due on said contract for the time plaintiffs enjoyed the rights secured to them by said contract or any other sum whatever in excess of the amount due defendant.

Defendant then pleaded the provision that any other reputable book-maker should be allowed by plaintiffs to operate on said track under the regulations enforced by plaintiffs. It then pleaded the custom of allowing book-makers to sell pools and make books for $100 per day, and then pleaded the correspondence between defendant and plaintiffs with refer-ence thereto as set out in the statement.   Defendant then averred that otherwise than by making such protest it in no manner or form interfered with or interrupted plaintiffs in the enjoyment of their rights under the contract.   Defendant then averred that said contract is void as against public policy in that it tends to encourage gambling, but if not so void, then an action had accrued to defendant for breach of said contract whereby it was damaged $12,000, for which it prayed judgment.

The cause was tried to the court without a jury and judg-ment was rendered for defendant and plaintiffs appeal.

I.   The petition alleges and the written contract con-clusively shows that defendant agreed in consideration of $90,000, to be paid in certain installments by plaintiffs, to sell and did sell to plaintiffs the exclusive betting and book-

making privileges on its race track for the May meeting in 1896, beginning May 9, 1896, and including July 4, 1896.

The effort to have this contract declared a lease and thereby furnish a basis for an apportionment of it in accordance with the principles governing leases, finds no support either in the pleadings or the evidence. It is a plain simple agreement, by which plaintiffs bought and partially paid for and for a time fully enjoyed the profits arising from the monopoly of controlling all the betting and wagering on the horse races to be run during the May meeting on defendant's track.

It was in no sense a lease but an exclusive privilege of reselling to the various book-makers the privilege of "making books," or, to use plain English, of gambling with the public who patronized that track.

This privilege concerned no interest in the realty, and defendant's right of possession was in no manner affected by the contract.

Whatever rights plaintiffs may have had under the contract, they are not referable to any lease acquired by the said agreement, and the argument based upon such a premise can not, under the pleadings and evidence be seriously entertained.

Betting on horse races is gambling in this State and has been so adjudged since the decision in Shropshire v. Glascock, 4 Mo. 536; Boynton v. Curle, 4 Mo. 600; Hayden v. Little, 35 Mo. 418; St. Louis Fair Association v. Carmody, 151 Mo. loc. cit. 571. And it is not to be questioned that the phrases "book-making" and "pool-selling" in the contract before us are but other names for betting and gambling on horse races, as in "book-making" the betting is with the "book-makers" and in "pool-selling" the betting is among the purchasers of the pool. [Swigart v. People, 154 Ill. 284.]

The contract then was by its terms an agreement and sale by defendant to plaintiffs to allow plaintiffs the exclusive privilege of gambling with the public on defendant's race

course at its May meeting in 1896, and the sole question is, will the courts of this State aid either party in the enforcement of such a contract? That they will not, no longer admits of a doubt.

In Fair Association v. Carmody, 151 Mo. 566, the defendant herein sought to enforce a similar contract against Carmody, but this court held the contract was founded upon an unlawful consideration, was against public policy, and invalid. The maxim of the common law, that "no right of action can arise from an illegal contract," obtains in all its vigor in this State.

But counsel for plaintiffs, while admitting this general principle of law, invokes the rule applicable to illegal and immoral contracts, that so long as such a contract is executory only, the right to recover back whatever had been paid thereon will be sustained by the courts, on the ground that it is not in affirmance of such contract but a disaffirmance thereof.

The rule is succinctly stated by Judge SCOTT in Skinner v. Henderson, 10 Mo. 205, in which he says: "The rule in respect of money paid on illegal contracts appears in general to be, that money so advanced may be recovered in an action for money had and received, while the contract remains executory, *because a violation of the law is thereby prevented;* but if the contract be executed, it can not be recovered back. When both parties are *in pari delicto, melior est conditio defendentis,* not because he is favored in law, but because the plaintiff must draw his justice from pure sources. [Buller's N. P., 132; Doug. 470 (a)."]

The underlying reason of the rule permitting a recovery when the contract is still merely executory is the encouragement of the abandonment of illegal contracts, and to prevent a violation of the law.

Plaintiffs seek to bring themselves within the protection of this rule to recover $13,959.19 of the $36,000 which they paid defendant while they were receiving the benefits of their

unlawful contract, on the theory that as they only took the profits of their contract for twelve days and by dividing the $90,000 by the whole number of days of the meeting, the pro rata due defendants for twelve days would be only $22,-040.81, and consequently they had overpaid defendant $13,-959.19.

Counsel in applying the rule that so long as the illegal contract is executory the party paying the money on it can recover it, say of the facts in this case: "So far as the contract had been performed it was executed, so far as unperformed it was executory, and that the contract was divisible, and therefore when they abandoned it on May 23, 1896, they were not only not liable and could not be compelled to pay the installments thereafter due, but could recover a proportionate part of that which they had paid." Among other cases counsel cite Adams Express Co. v. Reno, 48 Mo. 264. In that case John Reno had been convicted of robbing the county treasury of Daviess county, and was in the Missouri penitentiary. The county court of said county authorized Ballinger, the sheriff of said county, to submit a proposition to Clinton Reno, who resided in Indiana, that if he would pay $5,000 to the county by way of reimbursement of the amount stolen by John Reno, they would use their influence to procure a pardon. Clinton was able to raise only $4,400. This sum he intrusted to his sister, Laura, to bring to Missouri, thinking that Ballinger would accept it, and effect the pardon. He instructed her to bring the money back if the pardon was not procured, and to pay it to no one but Ballinger. She came to Jefferson City, but did not see Ballinger and nothing was done toward the pardon. Wilson, the warden, persuaded her to leave the money with him that Ballinger might come and take it, but she informed him of Clinton's directions. She was finally induced to do so, however, and took Wilson's receipt. Wilson thereupon deposited the money in bank for use of John Reno, and it was attached by the

express company as the property of John, to recover damages for a robbery alleged to have been committed by John Reno, Clinton Reno interpleaded and obtained judgment, and the express company appealed, and insisted that as the money was sent to this State for an illegal purpose, the law would not assist Clinton Reno to recover it. But this court held that there was no executed agreement between Ballinger and Clinton Reno, in fact none at all, as Clinton never raised the amount for which the county court and Ballinger were to try to procure John's pardon. No effort was made to influence the Governor, and Clinton had a right to recover.

It will be observed that in that case the court based its opinion upon the fact that the illegal purpose of attempting to or procuring the pardon was never consummated nor in fact entered upon. But apply that rule to this case. Here the plaintiffs entered upon the performance of the illegal and immoral contract, paid the installments due thereon until and including the fourteenth of May; sold the privileges of gambling without molestation until May 23, 1896. During this time the law was being violated by them as the result of the moneys they had paid to defendant, and which in part they now seek to recover.

The prime object of the rule, to-wit, the prevention of a violation of the law, can not then apply to this case.

If this court should by its judgment now decree a division of the purchase price paid by plaintiff for this unlawful arrangement, a contract, we have declared, immoral and unenforcible, we would be giving it all the sanction which we could give a lawful contract; and would permit plaintiffs to enforce the privileges secured by it so long as they deemed them profitable, reserving to them the right to abandon them whenever they elected so to do, and recover by legal process that portion of the consideration already paid, which they might deem not then earned, and that without a corresponding accounting for

the pro rata portion of their illegal gains, taken by virtue of their gambling privileges.

The rule invoked by plaintiffs has no application to a state of facts like those disclosed by the petition and evidence. Where both parties as in this case are *in pari delicto,* the courts of justice will not aid either to undo that which has already been done under the illegal and prohibited contract, nor to recover money paid in pursuance thereof, but will leave them in the position in which their unlawful acts have placed them. It is only where the contract remains wholly unexecuted on one side and where by its abandonment the act which the law forbids will be averted that the courts will lend a willing ear to the repentant party, and if he has paid money in advance will permit its recovery, but when as in this case he has carried into effect the unlawful design and in part at least violated the law in furtherance of such contract, the time for repentance has passed in which the law will let him recover moneys which he has embarked in the enterprise. The proportion of the moneys which plaintiffs now seek to recover is earmarked with illegality, and "the gates of legal and equitable relief and remedy are shut against them." [Sprague v. Rooney, 104 Mo. 358; Hooker v. De Palos, 28 Ohio St. loc. cit. 262; Nellis v. Clark, 20 Wend. 24; Perkins v. Savage, 15 Wend. 412; Miller v. Larson, 19 Wisc. 466.]

While the law will not permit defendant to enforce the unpaid installments or render plaintiffs liable for damages for a failure to perform their contract, it will not disturb the portion of the contract which has been executed by both parties.

The judgment of the circuit court that plaintiffs could not recover the part of the money which they paid in fulfillment of their illegal contract after they had partially received its illegal benefits, was right, and is affirmed. All concur.