THE STATE OF KANSAS, ex rel. JOHN S. DAWSON, as
Attorney-general, etc., *Plaintiff*, v. THE ANTHONY
FAIR ASSOCIATION, *Defendant*.

No. 17,931.

SYLLABUS BY THE COURT.

1. GAMBLING — *Bets on Horse ·Races — Nuisance.* Ordinarily,
bookmaking and pool selling by which bets on horse races are
recorded and tickets sold showing the purchaser's proportion
of the money won on such races constitute gambling, and the
place where it is carried on is a nuisance.

2. FAIR ASSOCIATION—*No Power to Allow Pool Selling or Book-
making.* A fair association chartered by the state under au-
thority of the statute to form private corporations for the
encouragement of agriculture and ·horticulture has no right
or authority to sell the privilege of using its buildings for
pool selling and ·bookmaking, and such association will at the
suit of the state be ousted from the exercise of such power.

3. POWER OF STATE—*To Suppress Gambling on Fair Grounds.*
The state which gave such an association its corporate life
may require it to refrain from conduct clearly against good
morals and which ordinarily constitutes a crime; and such
association can not demand that the courts enter upon a critical
examination of the effect and validity of statutes passed
for the general purpose of suppressing gambling in order to
remove the seal of condemnation.

Original proceedings in quo warranto. Opinion
filed April 12, 1913. Demurrer to the first cause of
action overruled.

*John S. Dawson,* attorney-general, for the plaintiff;
*F. P. Lindsay,* of Topeka, of counsel.

*T. A. Noftzger, Fred Washbon,* both of Anthony, and
*George Gardner,* of Wichita, for the defendant.

The opinion of the court was delivered by

. WEST, J.: The state, on the relation of the attorney-
general, brings this action to ·oust the Anthony Fair
Association from its exercise of the right to acquiesce in

and authorize pool selling and bookmaking. The charge is that the defendant was chartered "To give County Fairs annually also race meetings at Anthony, Kansas, buy and own and hold real estate and personalty necessary for such purposes, and do such [each] and every lawful thing necessary for the proper carrying out of said purposes"; that the defendant, in the month of August of each year since its organization has held a race meet and fair in an enclosure consisting of about twenty acres, at which meeting during a period of four days the association, by and through its officers, servants and agents, and by the consent of its directors and managers, has erected near the grand stand, within the enclosure of the fair ground but immediately outside of the race track, a large shed, which is divided into booths, and has at each of the meetings and fairs sold to certain persons and issued the right to register and record bets and wagers and the selling of pools upon the result of the races carried on within the race track, and that there has been at such fairs and race meetings from one to three persons engaged in the selling of pools and in bookmaking in such booths, issuing to the party purchasing it a ticket and registering the same, and after the race paying out the amount evidenced by such ticket, which depended upon the result of such race; that during the various race meetings large amounts of money have been hazarded and lost as the result of races through such system of selling pools. To this complaint a demurrer was filed, and it is argued by the defendant fair association that the legislature has practically licensed pool selling by fair associations, and hence that the amended petition does not state a cause of action.

Chapter 15 of the Laws of 1874, an act relating to agricultural organizations, provided that:

"Any person who shall sell pools, engage in any games of chance or gambling devices of any kind, . . . upon any fair ground in this state during the

holding of any fair, and any officer of any fair asso-ciation who shall authorize or permit such pool selling, . . . shall, upon conviction, be fined not less than $25 nor more than $100, for each and every offense." (Laws 1874, ch. 15, § 3, Gen. Stat. 1909, § 8149.)

It is contended that this provision was nullified by chapter 155 of the Laws of 1895 (Gen. Stat. 1909, § 2865), an act to prohibit bookmaking and pool sell-ing. This act makes it a misdemeanor punishable by imprisonment in the county jail for one year and by fine of $1000 to keep any room, shed, booth or building or to occupy one upon any public or private grounds within the state with any book, instrument or device for the purpose of recording or registering bets or wagers or selling pools upon the result of any trial or contest of skill, speed or power of endurance of man or beast which is to be made or take place within or beyond the limits of this state. A similar penalty is prescribed for any owner, lessee or occupant of any tent, booth or building who owns or permits the same to be used or occupied for the purposes already men-tioned. The act contains the following exception:

"Except within the enclosure of a race track and upon races or trials of speed being conducted within said enclosure; provided, that the exception herein shall not apply to any race track or enclosure for more than two weeks in any one year."

It is insisted that this act covers the entire ground of the one first referred to and therefore by implication repeals it, and amounts to the last expression of the legislative will to the effect that pool selling upon races within the enclosure of a race track is legal for two weeks in any one year.

It is interesting to note that in 1895 the Missouri leg-islature passed an act almost identical with the one here involved, and in *State v. Walsh,* 136 Mo. 400, 37 S. W. 1112, it was held unconstitutional as being in viola-tion of the provision of the Missouri constitution

against special laws granting exclusive right, privileges or immunities. In the opinion it was said:

"If such an act as that being discussed can stand the test of judicial scrutiny, then the above cited provisions of section 53, aforesaid, relative to the prohibition against granting by special law any special or ex-clusive right, privilege or immunity will have been or-dained in vain. Nay, more, if such legislation as that here presented could be sanctioned, then it would be an easy legislative task to provide for the punishment of robbery, arson, murder—indeed, the whole category of crimes—with a proviso that nothing in this act shall be so construed as to prohibit or make it unlawful for any person 'to rob, burn or murder' 'on the premises or within the limits or enclosure of a regular race course,' etc." (p. 406.)

This ruling was affirmed in State v. Thomas, 138 Mo. 95, 39 S. W. 481. However, from the opinion in State v. Thompson, 160 Mo. 333, 60 S. W. 1077, it appears that in 1897 the Missouri legislature departed from the plan adopted by Missouri and Kansas in 1895 and passed an act against pool selling and the like without first having obtained a license, and providing that "any person of good reputation" (p. 340) desiring to obtain a license to sell pools should apply in writing under oath to the state auditor, who, "if satisfied with the good character" (p. 340) of such an applicant and of the good repute of the race course or fair ground, might issue a license. This was held to be constitutional, al-though it was expressly said in the opinion (p. 341) that it was apparently clear that bookmaking and pool selling within the scope of the act were gaming or gambling. It was also noted that it had been held in State v. Clarke, 4 Mo. 17, that St. Louis could license bawdy houses, and that a license taken out in con-formity with the ordinance would shield the holder from criminal proceedings by the state. In February, 1902, the same court, in Ullman v. St. Louis Fair Assn.,

167 Mo. 273, 66 S. W. 949, 56 L. R. A. 606, decided that one who paid the owner of a race track for the exclusive business of bookmaking and pool selling could not, after enjoying his privilege for a time, abandon it and recover back the money paid in excess of the *pro rata* amount. In the opinion it was said (p. 283) that it was not to be questioned that the phrases bookmaking and pool selling are but other names for betting and gambling, and it was held that the courts should not enforce the contract, as the plaintiff was *particeps criminis* and not entitled to the assistance of judicial process. The court of appeals of the District of Columbia, in *Miller v. The United States,* 6 App. D. C. 6, decided that bookmaking on a horse race is a game of chance or gambling device or contrivance within the meaning of the act of congress of January 31, 1883, and that a bookmaker's booth is a place for gaming within the meaning of that act, and common-law authorities as far back as the statute of Anne were cited to show that a horse race is a game of chance where wagers have been made upon it. In *Moulton v. Westchester Racing Ass'n.,* 84 N. Y. Supp. 871, a New York statute of 1895 providing that money bet on a race course or on the result of any race could be recovered in a civil action by the person with whom the bet was made, was considered. It was suggested in the opinion that the legislature in its wisdom had appointed the forfeiture of money wagered the sole sanction for the constitutional prohibition against gambling, so that on race tracks only the operation of the penal code regarding gambling was suspended, and betting on horse racing was not, as elsewhere throughout the state, a public nuisance and a crime. The court said:

"Such a segregation of practices, called in their recognition contrary to good morals, is novel, though not wholly new in this country. It has been tried and abandoned in one state in the Union, and is said to be in vogue in the Orient and elsewhere abroad as to a less namable occupation." (p. 874.)

It was stated that whether such legislation, making "one rule for rich and poor, for the favor at court, and the countryman at the plow" (p. 874), was constitutional need not be determined.

In *Levy v. Kansas City, Kan.*, 168 Fed. 524, 22 L. R. A., n. s., 862, the court of appeals of the eighth circuit upheld the trial court in sustaining a demurrer to a complaint brought to recover back a license fee alleged to have been accepted from the plaintiff and wrongfully retained by defendant after repudiation of the privileges granted by the license, on the ground that no action may be maintained which arises out of the plaintiff's moral turpitude or out of his violation of a general law enacted to effectuate the public policy of a state or nation. Kansas City granted Levy a license to carry on pool selling and bookmaking for one year for $5000, and the second day after he had paid for it stopped him and prevented him from carrying on his business, and he sued the city to recover back the $5000. The court referred to the act of 1895, making pool selling unlawful except within the enclosure of a race track not exceeding two weeks in any year, and said that although the action of the city in taking Levy's money and then depriving him of it two days later was abhorrent to the sense of fairness and justice and despicable, nevertheless he had knowingly engaged in a contract which involved his own moral turpitude or the violation of a general law enacted to carry into effect a public policy, and therefore he could not be heard to complain. It was held that section 50 of chapter 122 of the Laws of 1903 (Gen. Stat. 1909, § 912), authorizing cities to restrain, prohibit and suppress games and gambling houses, was not intended to modify or repeal the act of 1895 and did not repeal it.

In *Levy v. Kansas City*, 74 Kan. 861, 86 Pac. 149, it appeared that the same plaintiff sought to enjoin the city from interfering with his conducting a gambling business pursuant to the same license involved in the

case just referred to. The court said (p. 862) that this was probably the first instance in the history of the state that a professional criminal had had the effrontery to apply to a court of equity for protection from arrest and prosecution while pursuing his criminal vocation.

"It would indeed be a sad commentary on our jurisprudence if a justification could be found for holding that a license to commit crime, issued by a city administration, could be made the basis of equitable interference for the protection of the holder from public prosecution while he continues to violate the law." (p. 862.)

That a fair association whose corporate life has been granted by the state should claim the right to authorize and rent a place for gambling at its fair grounds is somewhat novel. The legislature of 1895 also enacted chapter 153, an act to prohibit gambling and to repeal certain sections of the General Statutes of 1868, and providing that any person who shall either directly or indirectly bet any money or property at any common gaming house or at any place at which persons are accustomed to resort for gambling purposes, or any place kept for the purpose of being used for the purpose of gambling, whether such betting be upon any game of skill or chance, either with or without cards or dice or by the use of any kind of device for determining chance, shall be guilty of a felony. Also chapter 154, providing for the destruction of all gaming tables or devices. Also chapter 151, making it a felony to set up or keep any table or gaming device adapted, devised or designed for the purpose of playing any game of chance for money or property, and making it a felony for any person knowingly to lease or rent to another any house, building, shed, booth, lot or other place for any of the unlawful uses referred to and declaring such places nuisances and providing for their abatement. Chapter 263 of the

Laws of 1907 declares such places common nuisances and provides for their abatement and the destruction of the property therein found, and. authorizes the county attorney or attorney-general to proceed as in case of violation of the prohibitory act when notified that such places are being conducted. This legislation will be found in sections· 2725 to 2740 of the General Statutes of 1909. In addition to this, section 2745 makes it a misdemeanor to set up or keep a common gaming house, and section 2746 makes it a misdemeanor to knowingly lease or rent to another any house or building for the purpose of setting up or keeping therein any gaming tables or devices for use as a gaming table. From these various provisions it is readily seen that gambling in any form has not been a favorite with the legislature of this state.

The corporation act (Gen. Stat. 1909, § 1699, subdiv. 4) authorizes the formation of a private corporation for "the encouragement of agriculture and horticulture." Just how argiculture, much less horticulture, could be encouraged by betting on horse races so that, as the amended petition alleges and the demurrer admits, "there has been a large amount of money in large sums received, hazarded and lost on the result of races through such devices and systems of selling pools," is not self-evident, and no solution is suggested by the defendant. Certain it is that nothing found in the charter granted this association can be construed to authorize it to lease its buildings for and profit by conduct which the common judgment of modern times deems immoral and which the legislature has generally · denounced as a crime, or which makes such buildings common nuisances. True, it is argued that pool selling at the time and place charged is legalized by the act of 1895, and doubtless the theory is that if the state permits natural persons to sell pools it can not or should not prevent an artificial person from renting a place for such selling. We do not deem it imperative

to decide at this time whether an act making gambling a crime at all times and places punishable by severe penalties and excepting out two weeks in each year at certain locations is valid, or whether such a statute is of "uniform operation throughout the state" (Const. art. 2, § 17; *Rambo v. Larrabee*, 67 Kan. 634, 73 Pac. 915), or whether, if valid, it repeals the act of 1874. It is necessary only to hold that, aside from such considerations, the state has the right to say that a fair association to which it has given corporate life in order to encourage agriculture and horticulture shall refrain from conduct which is clearly against good morals and is a crime under ordinary circumstances, and which can not escape the condemnation of criminality save, if at all, by a critical examination into the validity and effect of statutes enacted for the general purpose of suppressing gambling.

"Wilful assumptions and intentional usurpations of corporate authority or any abuse, misuse, or non-use of its franchises, justifies a proceeding by or in the nature of quo warranto, and a judgment of forfeiture of the franchise possessed. . . . It is well settled that it is a tacit condition of a grant of incorporation that the grantees shall act up to the end or design for which they were incorporated, and hence through neglect or abuse of its franchises a corporation may forfeit its charter as for condition broken. . . . And it (quo warranto) may be resorted to in cases of public nuisance such as affect or endanger the public safety or convenience and require immediate judicial interposition." (2 Beach on Private Corporations, § 434.)

As to the second cause of action no question is presented and nothing need be said.

The demurrer to the first cause of action is overruled.