WELLSTON KENNEL CLUB, a Voluntary Association, v. HARRY W. CASTLEN, Prosecuting Attorney of St. Louis County; ALFRED C. LILL, Sheriff of St. Louis County; STRATTON SHARTEL, Attorney-General of Missouri; ROBERT F. STANTON, County Counselor of St. Louis County, and R. H. BAUMER, Constable of St. Ferdinand Township, St. Louis County, Appellants.—55 S. W. (2d) 288.

Court en Banc, December 16, 1932.

*Harry W. Castlen,* Prosecuting Attorney, *Herbert W. Ziercher,* Assistant Prosecuting Attorney, *Stratton Shartel,* Attorney-General, *Albert Miller,* Assistant Attorney-General, *Robert F. Stanton* and *George F. Heege* for appellants.

*T. J. Rowe, Henry Rowe* and *Thos. J. Rowe, Jr.,* for respondent.

ATWOOD, J.—On April 15, 1932, respondent, Wellston Kennel Club, describing itself as "an unincorporated joint stock association," filed bill for injunction in the Circuit Court of St. Louis County, Missouri, against the Prosecuting Attorney, the Sheriff and the County Counselor of said county, the Attorney-General of the State, and the Constable of St. Ferdinand Township in said county and state, appellants herein, to restrain them from interfering in any manner with respondent's activities in conducting, using and participating in the public subscription plan or system of raising funds and awarding purses, defraying expenses and awarding "oversubscriptions" therefrom within its race track (for dog racing) located on State Highways U. S. 40 and U. S. 61, in said county and State. Defendants filed special demurrer thereto on the ground that plaintiff was without legal capacity to sue. The demurrer was overruled and final judgment was entered on May 11, 1932, permanently enjoining defendants as prayed, from which judgment they have appealed. On motion the appeal was advanced because of public interest involved.

Appellants assign error to the court's action in overruling their special demurrer; also, to rendition of the judgment because plaintiff's petition fails to state facts sufficient to constitute a cause of action against defendants. We shall consider the latter assignment first.

In 14 Ruling Case Law, pages 426, 427, section 130, it is said:

■ "The general rule is that a court of equity has no jurisdiction or power to interfere to arrest the authorities charged with the execution of the criminal law, whether it pertains to the State at large, or to the municipalities, which are agencies in the administration of civil government. This interference has been held so completely beyond the jurisdiction of courts of chancery that their decrees in in such cases have been disregarded as absolutely void in collateral proceedings, and persons arrested for contempt for violating their injunctions discharged on *habeas corpus.*"

State ex rel. v. Wood, 155 Mo. 425, 449, 56 S. W. 474; In re Sawyer, 124 U. S. 200; and Fitts v. McGhee, 172 U. S. 516, are illustrative of its broad recognition. This rule is founded on sound principles of public policy, having regard to the fact that criminal prosecutions are matters peculiarly within the province of common-law courts, and that assumption of jurisdiction in such cases by a court of equity would be an invasion of the domain of the latter tribunals. [14 R. C. L., p. 428, note 4; 32 C. J., sec. 444, p. 280, 281.] In Foley v. Ham, 102 Kan. 66, L. R. A. 1918C, 204, 209, it is said:

"A court of equity has no jurisdiction of criminal matters, that subject being committed to courts of law; as a matter of public policy the courts ought not to interfere with the representatives of the public seeking enforcement of the law."

In Kearney v. Laird, 164 Mo. App. 406, 414, 144 S. W. 904, and in Russo v. Miller, 3 S. W. (2d) 266, 269, 221 Mo. App. 292, attention is directed to the fact that the complaining party ordinarily has an adequate remedy at law, either by an action for damages, or by a criminal prosecution.

■ ■ Counsel for respondent concede that such is the general rule, but insist that plaintiff's allegations of threatened trespass and irreparable property loss bring it within the exception that police officers may be enjoined from *illegally* doing irreparable injury to the property of an individual. Of this exception it is said in 32 Corpus Juris, section 443, page 280:

"It is only where the statute or ordinance is *unconstitutional or otherwise invalid* and where in the attempt to enforce it there is a direct invasion of property rights resulting in irreparable injury that an injunction will issue to restrain the enforcement thereof. Both of these elements are indispensable, and the latter element is not present where it appears that the injury or loss to plaintiff's business

or rights of property would be only such as would incidentally flow from the arrest and prosecution thereunder." [Italics ours.]

In Shuman v. Gilbert, 209 Mass. 225, Ann. Cas. 1918E, 793, it is said (quoting from Traux v. Raich, 239 U. S. 33, 37, 38 Ann. Cas. 1917B, 283) that "equitable jurisdiction exists to restrain criminal prosecutions under *unconstitutional enactments,* when the prevention of such prosecution is essential to the safeguarding of rights of property." [Italics ours.] The exception is well recognized within the scope thus indicated, and in State ex rel. v. Wood, 155 Mo. 425, 56 S. W. 474; Merchants' Exchange of St. Louis et al. v. Knott et al., 212 Mo. 616, 111 S. W. 565; and State ex rel. v. Hall, 250 S. W. 64, 297 Mo. 594, relied upon by respondent with respect to this point, the constitutionality of the statutes sought to be enforced were expressly challenged. In the instant case, however, no question is raised as to the constitutionality or validity of any law or statute. The bill simply alleges the nature and conduct of plaintiff's proposed business, alleges that defendants threaten prosecutions therefor under certain statutes by reason of which plaintiff will suffer invasion of property rights and irreparable injury, pleads the legal conclusion that none of its proposed activities will be violative of any law or statutes of this State, and prays that defendant police officers be enjoined from in any manner interfering therewith. There may be serious question whether such allegations alone are sufficient to invoke equity jurisdiction (Arbuckle v. Blackburn, 113 Fed. 616, 625, App. dism. 191 U. S. 405; Jacob Hoffman Brewing Co. v. McElligott, 259 Fed. 525; Shuman v. Gilbert, 229 Mass. 225), but there can be no doubt that the petition fails to state a cause of action against defendants if the well pleaded facts disclose that the business in question contravenes any law or statute of this State—this for the reason that defendants are charged with the public duty of enforcing the law in the performance of which they would not be *illegally* doing irreparable injury to plaintiff's property, and for the additional reason that equity will not assist a complainant in carrying on an unlawful business. [32 C. J., p. 231, n. 41.] Decision of the first question will be reserved if from the petition it appears that the business in question is unlawful.

Looking to plaintiff's petition for the facts in the case we find that its objects and purposes, as set forth in its articles of association, are as follows:

"To own, lease, construct, maintain and operate race course grounds; to conduct greyhound racing and other racing contests and exhibitions; to create or make up and award or distribute purses upon trials or contests of speed and endurance between and among racing hounds upon the public subscription plan or system; to conduct agricultural fairs, live-stock and other shows, fairs, entertain-

ments and amusements; to lease and let to others the right to maintain and operate restaurants and stores and booths for the lawful sale of food and refreshments and all other articles of merchandise of every kind and character whatsoever on said grounds; and to do and transact any and all other lawful business usually transacted by or appertaining to race track or amusement enterprises.''

It is also alleged therein that plaintiff ''has leased a certain tract of land located on State Highway No. U. S. 40 and U. S. 61, in St. Louis County, Missouri, for the purpose of conducting its said business in accordance with the terms of its said articles of association; that the said tract of land is now improved and equipped with grandstand for spectators, tracks, kennels and stalls for the purpose of conducting racing and race hound meetings, and that it has paid and has become obligated to pay in the lease, rehabilitation, improvement and equipment of said grounds for the purposes aforesaid a large sum of money, to-wit $100,000; that it is the purpose and intention of plaintiff to inaugurate and carry on said business for which it was organized, at the place aforesaid.''

It is further alleged that plaintiff ''has provided a place within its said race track grounds, an inclosure where it is intended to hold said races, at which plaintiff intends to conduct and supervise the public subscription or system of creating or making up an award or disbursing stipulated purses on said races for the use and benefit of such of its patrons as may wish to subcribe thereto; . . . that said public subscription plan or system is a tripartite arrangement or agreement whereby the plaintiff and the owners of the several entries in each of said races and such of its patrons as shall become subscribers to the purse therein in the manner hereinafter described may create or make up a purse on each of the races to be run at said meeting, and after the same is run, award and disburse said purse and, when necessary, any over-subscription thereto, in the manner hereinafter alleged; that the said public subscription plan or system which plaintiff intends to and will supervise and conduct in connection with said racing at said race meetings within the enclosure of said grounds will be supervised and conducted in manner and form hereinafter set out.

''Plaintiff states that said races or contests, in the result of which it has no financial interest, are arranged to test the speed of such hounds as may be duly entered in each of said races under the rules and regulations of said association; that no more than eight hounds will contest in each race; that plaintiff will offer a purse of not less than $100 nor more than $150 for the winners of each of said races, which said purse shall be distributed under the terms and conditions of a contract of entry made between the owner of each of said hounds

entered in each of said races and plaintiff, which said contract in blank form is in words and figures as follows, to-wit:

" 'Entry Lease.

Name_____  Day_____

Color_____  Race_____

Age_____  Entry No. _____

Sex_____

Sire_____.

Dam_____

" 'The owner of the above entered dog hereby leases the dog to the Wellston Kennel Club for the above-named race under the following conditions, to-wit:

" 'That should the dog finish first, said Wellston Kennel Club will pay said owner 70 per cent of the purse named in the condition book of the meeting. Should the dog finish second, 20 per cent and if it finishes third, 10 per cent.

" 'The owner agrees to pay the entry fee and deliver the dog in the paddock fifteen minutes before the time set for said race, in proper racing condition, and also agrees to hold said Wellston Kennel Club blameless for any injury in said race.'

"Plaintiff further states that it will publish and circulate a printed program which shall designate each race and the hounds entered therein by number and that an employee or employees of plaintiff will accept from patrons in attendance subscriptions to the said purses offered in each of said races, and will issue and deliver to any patron who shall make such subscription to said purse a receipt, which, in blank form, is in words and figures as follows, to-wit:

" 'Subscription Contract.

" ' (The numbers correspond with the number of the race and entry on the printed program.)

Amount _____

Race _____

Entry _____

" ' (The above sum is received upon the conditions printed on the reverse side hereof.)

" ' (Reverse side.)

" 'The holder of this receipt has contributed the amount indicated on the reverse side hereof to the Wellston Kennel Club, which becomes absolute owner thereof, to defray expenses, provide suitable purses and induce the entry number indicated on the reverse side hereof, and other entries, to enter the race indicated by number on

the reverse side hereof under the rules of the association. The numbers correspond with the numbers on the official program.

" 'If the entry number indicated on the reverse side hereof shall be first in the race, the holder will be paid the proportion of 70 per cent of all that remains, if any, of the contributions made to the race, after payment of purses and expenses, that the amount received hereunder bears to the total amount so remaining. If the entry number indicated on the reverse side hereof shall be second in the race, the holder will be paid 20 per cent of the aforesaid amount. If the entry number on the reverse side hereof shall be third in the race, the holder will be paid 10 per cent of the aforesaid amount.'

"Plaintiff further states that under and in accordance with the terms and conditions of the aforesaid contract to be entered into by and between all of the aforesaid parties in each of said races plaintiff will pay to the owner of the hound which finishes first 70 per cent of the aforesaid purse, and to the owner of the hound which finishes second 20 per cent of the aforesaid purse, and to the owner of the hound which finishes third 10 per cent of the aforesaid purse, and to each of the subscribers to each of said purses holding and presenting receipts bearing the numbers of the hounds finishing first, second and third, respectively, 70 per cent, 20 per cent and 10 per cent of all entry fees paid by the owners of hounds entered in said race and all subscriptions made to the race remaining after the payment of the purse aforesaid, and all expenses of said race, which the amount of said subscription receipts bear to the number of the hounds finishing first, second and third, respectively, bears to the whole amount of the said entry fees and subscriptions so remaining."

Counsel for respondent argue at length that payment of an entry fee by an owner of a race horse or dog for the purpose of competing with other owners similarly disposed for a purse to be awarded on the result of the race does not constitute a wager or bet. But this is beside the question. There is no allegation in plaintiff's bill that defendants will interfere with its dog racing merely because all owners pay entry fees and only those whose dogs win races participate in the purses awarded. The contention is that defendants will interfere with plaintiff's proposed activities in conducting, using and participating in the public subscription plan or system of raising funds and awarding purses, defraying expenses and awarding so-called "oversubscriptions" in connection with its races. The single question is whether the proposed use of this plan or system would, on the allegations appearing in the petition, be violative of any law or statute of this State.

Among the laws of which counsel for appellants say the plan or system in question would be violative is the provision with reference

to pool selling which appears in the third clause of section 4286, Revised Statutes 1929, and makes any person guilty of a felony "who in this state records or registers a bet or wager or sells pools upon the result of any trial or contest of skill, speed or power of endurance of man or beast, which is to be made or take place within or without this state."

"Pool selling" is a term used by writers of authority to describe a form of gambling. [In re Opinion of the Justices, 73 N. H. 625, 6 Ann. Cas. 689.] It imports a transaction, where the money of some person other than the seller of the pool is to be received by him. [People v. Bennett, 113 Fed: 515, 516.] In 12 Ruling Case Law, pages 720, 721, section 19, a pool, as the term is used in connection with horse racing and contestants in games, is defined as "a combination of a number of persons, each staking a sum of money on the success of a horse in a race, or a contestant in a game, the money to be divided among the successful bettors according to the amount put in by each." The term is commonly used to designate a sum of money "made up by the contributions of several persons, each of whom then makes his guess or prediction as to the event of a future contest or hazard, the successful bettor taking the entire pool." [Black's Law Dictionary.] A pool is also defined in Commonwealth v. Ferry, 146 Mass. 203 as "a combination of stakes, the money derived from which was to go to the winner." But in Commonwealth v. Sullivan, 218 Mass. 281, Ann. Cas. 1916 B, 98, 99, the same court said: "This does not mean, however, that all the money derived from the combination of stakes must go to the winner. Commonly the man who runs the pool makes something out of the transaction. It is enough to constitute the criminal offense if there is a combination of stakes a part of which is to go to the winner." In Ullman v. St. Louis Fair Association, 167 Mo. 273, 283, 66 S. W. 949, we said that "in 'pool-selling' the betting is among the purchasers of the pool." See, also, St. Louis Fair Assn. v. Carmody, 151 Mo. 566, 572, 52 S. W. 365; and Swigart v. People, 154 Ill. 284. It thus appears that pool selling, as it pertains to racing, is simply a scheme for facilitating betting on races, the event of the race determining the winners each of whom participates in the winnings according to the amount he has contributed to the pool. [Lacey v. Palmer, 93 Va. 159, 31 L. R. A. 822, 824.]

In Funk & Wagnall's New Standard Dictionary a bet is defined as "the risking of a certain thing or sum against another specified thing or sum on the issue of an uncertain event." Also, in Black's Law Dictionary a bet is defined as "an agreement between two or more persons that a sum of money or other valuable thing, to which all jointly contribute, shall become the sole property of

one or some of them on the happening in the future of an event at present uncertain, or according as a question disputed between them is settled in one way or the other.'' As said in Harris v. White, 81 N. Y. 532, 539, each party to a bet ''gets a chance of gain from others, and takes a risk of loss of his own to them.'' In Commonwealth v. Sullivan, supra, a bet is defined as ''the hazard of money or property upon an incident by which one or both parties stand to lose or win by chance.'' Bet and wager are synonymous terms, and are applied both to the contract of betting or wagering and to the thing or sum bet or wagered. The necessary elements entering into a transaction which gives it the character of a bet or wager are thus clearly stated in Treacy & Wilson v. Chinn, 79 Mo. App. 648, 651:

''Bouvier defines a wager to be 'a contract by which two parties or more agree that a certain sum of money or other thing shall be paid or delivered to one of them on the happening or not happening of a certain event.' This definition implies that there must be at least two parties to every wager in which one stands to win and the other to lose some valuable thing upon the certain result of a particular event. In such a case each party jeopardizes something, and each has the chance to win something.''

From the foregoing definitions it seems clear that respondent's proposed public subscription plan or system of raising funds and awarding purses, defraying expenses and awarding ''oversubscriptions'' therefrom in connection with dog races embraces every essential element of pool selling denounced in the above quoted provision of Section 4286. The certain result is that three of the eight dogs, if that many be entered in the race, will participate in the purse and the others will not. The uncertain event is which dogs will participate. Each ''subscriber'' stands to win or lose money from or to the other by this uncertain event. The money ''subscribed'' constitutes the ''pool,'' and whoever sells the subscription contracts in legal effect sells tickets to or shares in the pool. It is a common incident of pool selling that expenses be set aside from the total amount subscribed, and the nature of the scheme is essentially the same even though in effect it be stipulated that the seller of the pool shall also retain a part of the total amount so remaining. The amount thus retained would only affect the attractiveness of the scheme to subscribers, and that such would by no means be destroyed is fully demonstrated by plaintiff's allegation of fact that ''unless it can conduct and supervise the said public subscription plan of creating and awarding purses, as aforesaid, the said races will not be sufficiently patronized by the public to conduct the said races without financial loss and the business of plaintiff will be destroyed and the said property of plaintiff will be wholly lost to plaintiff.''

However ingenious the method of distributing "oversubscriptions" may be the essence of gambling plainly inheres.

But counsel for respondent say that a subscription to a dog race is not a bet or wager, and that "a subscription, being legal in its incipiency, the manner of its subsequent disbursement cannot illegalize it." A bet is a bet by whatever name it may be called. Respondent's so-called "public subscription plan" is obviously a sham for the transaction of a business expressly forbidden by law, and as said in St. Louis Fair Assn. v. Carmody, 151 Mo. 566, 574, 52 S. W. 365: "A scheme lawful in itself cannot be made a cover for one that is unlawful." In the same opinion (p. 575) we also said that "if the contract apparently lawful was made with a view to facilitate or encourage the unlawful act of a third person, it is unlawful." This identical plan, as applied to horse racing, was considered and condemned as betting or wagering in Ex parte McDonald, 260 Pac. 842. In Erlanger Kennel Club v. Daugherty, 213 Ky. 648, a similar plan in connection with dog racing was denounced as pool selling. Also see State ex rel. v. Amus. Co., 124 Ohio St. 518, 79 A. L. R. 568. In State ex inf. v. Ramona Kennel Club, 320 Mo. 740, 745, 8 S. W. (2d) 1, we have lately said: "No kind of reasoning can point to a difference between a horse and a dog race, so far as the act of gambling is concerned." The recent decision of the Florida Supreme Court in Pompano Horse Club et al. v. State ex rel., reported in 111 So. 801, 52 A. L. R. 51, holding that the conducting of the sale of certificates under the "pari-mutuel" betting plan therein described (1. c. 812, 813), which is similar to the plan here proposed, constituted engaging in a game of chance, and likewise gambling, is in accord with the weight of authority on this precise point. [52 A. L. R. Ann. p. 74.] See, also, State ex rel. AK-Sar-Ben Exposition Co. (Neb.), 226 N. W. 705 and 236 N. W. 736. In State v. Thompson, 160 Mo. 333, 341, 60 S. W. 1077, we held that pool selling was gaming or gambling, and the selling of pools on horse races is generally held to be gambling. [State v. Shanklin, 51 Wash. 35; Opinion of Justices, 73 N. H. 625; Lacy v. Palmer, 93 Va. 159.] The purchase of certificates at a pooling booth, operated in connection with a dog-race track, which certificates entitled the holders to shares in the "earnings" of the dogs in proportion to the "investments" (after the deduction of expenses, the operator of the booth retaining 10 per cent for his services), was held to be gambling, within a statute which denounced, as gambling, betting upon the result of any trial or contest of skill, speed, or power or endurance of man or beast, in Reinmiller v. State (1927), 93 Fla. 462, 111 So. 633. Looking, as we must, to the real nature of the transaction and the dominant factor in the scheme it is apparent that the proposed business is violative not only of the

pool selling provision of Section 4286, but also of the further provision of the same statute that makes any person guilty of a felony "who becomes the custodian or depository of any money, bet or wager or to be bet or wagered, upon any trial or contest of skill, speed or power of endurance of man or beast which is to be made or take place within or without this state."

Appellants also contend that from the allegations of the petition the proposed business would be violative of other laws and statutes of this State, but for the purposes of this appeal it is unnecessary to rule thereon. Plaintiff's petition, for the reasons above mentioned, having failed to state a cause of action against defendants the judgment rendered is void and without effect. Entertaining this view of the case it becomes unnecessary for us to rule on appellant's first assignment of error.

The judgment is reversed. All concur.