No. 69,616

STATE OF KANSAS, *ex rel.* ROBERT T. STEPHAN, Attorney General, *Petitioner*, v. THE HONORABLE JOAN FINNEY, Governor of the State of Kansas, *Respondent*.

(867 P.2d 1034)

Opinion filed January 27, 1994.

*Carla J. Stovall*, special assistant attorney general, argued the cause, and *Robert T. Stephan*, attorney general, and *Jeffrey A. Chanay*, of Entz & Chanay, of Topeka, were with her on the briefs for petitioner.

*Pedro L. Irigonegaray*, of Irigonegaray & Associates, of Topeka, argued the cause, and *Elizabeth R. Herbert* and *Robert V. Eye*, of the same firm, were with him on the briefs for respondent.

*David V. Schneider*, of Topeka, was on the brief for *amicus curiae* Kansans for Life at Its Best.

The opinion of the court was delivered by

LOCKETT, J.: In accordance with Senate Resolution 1844, dated March 30, 1993, the Attorney General filed this mandamus and quo warranto action to determine the Governor's authority to negotiate compacts with Indian tribes which authorize casino gambling or other Class III gaming on Indian lands which is not specifically authorized by Kansas statute or by the Kansas Constitution. Respondent removed the matter to the federal courts. The federal court subsequently remanded the action to this court.

After remand, at a prehearing conference the parties agreed that the issues would be limited to:

1. What is a lottery as that term is used in Art. 15, § 3 of the Kansas Constitution?
2. Did the adoption of Art. 15, § 3c alter the broad definition of lottery previously expressed in Kansas judicial decisions?
3. What effect do the provisions in the Kansas Criminal Code relative to gambling (K.S.A. 21-4302 through 21-4308) have on the issues herein, with particular reference to *Citizen Band Potawatomi Indian Tribe v. Green*, 995 F.2d 179 (10th Cir. 1993)?
4. With reference to the status of casino-type (Class III) gambling or gambling devices in Kansas, is there a distinction between the terms "permits" or "are legal," and, if so, the significance thereof in this litigation?

To answer Issues 3 and 4, federal law must be applied.

The interpretation placed on the Constitution and laws of the United States by the decisions of the Supreme Court of the United States is controlling upon state and federal courts and must be followed. *Murray v. State*, 226 Kan. 26, Syl. ¶ 1, 596 P.2d 805 (1979). The interpretation of the constitution of the State of Kansas and the laws of Kansas by the Supreme Court of Kansas is controlling upon the federal and all Kansas courts. *Quality Oil Co. v. du Pont & Co.*, 182 Kan. 488, 493, 322 P.2d 731 (1958).

The federal courts are the proper forum to answer the federal questions posed in Issues 3 and 4, which relate both to the Johnson Act, 15 U.S.C. § 1171 *et seq.* (1988), and the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 *et seq.* (1988). We will only address the state constitutional questions found in Issues 1 and 2.

Since the admission of Kansas to the Union in 1861, the Kansas Constitution has provided that "[l]otteries and the sale of lottery tickets are forever prohibited." Kan. Const. art. 15, § 3. Statutory prohibitions of lotteries and the sale of lottery tickets were enacted in 1895. See L. 1895, ch. 152, §§ 1-6, codified in G.S. 1909, §§ 2856 through 2861 and later as G.S. 1949, 21-1501 through 21-1506. On November 4, 1986, Kansas citizens amended the Kansas Constitution to authorize a state-owned and operated lottery, providing:

"Notwithstanding the provisions of section 3 of Article 15 of the constitution of the state of Kansas, the legislature may provide for a state-owned and operated lottery, except that such state-owned lottery shall not be operated after June 30, 1990, unless authorized to be operated after such date by a concurrent resolution approved by a majority of all of the members elected (or appointed) and qualified of each house and adopted in the 1990 regular session of the legislature. The state shall whenever possible provide the public information on the odds of winning a prize or prizes in a lottery game." Kan. Const. art. 15, § 3c.

In 1990, the Kansas Legislature extended the life of "a state-owned lottery" indefinitely. L. 1990, ch. 370.

On October 17, 1988, the IGRA became law. The act classifies gaming into three categories and the provisions for regulation differ depending upon the class. Class I gaming is defined as "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as part of, or in connection with, tribal ceremonies or celebrations." 25 U.S.C. § 2703(6) (1988). Class I gaming on Indian lands is within the exclusive jurisdiction of the Indian tribe and is not subject to the IGRA. 25 U.S.C. § 2710(a) (1988). Class II gaming on Indian lands is also within the jurisdiction of the Indian tribe, but it is subject to the IGRA and is regulated in part by the National Indian Gaming Commission. 25 U.S.C. § 2710(a)(2); 25 U.S.C. § 2705 (1988); 25 U.S.C. § 2706 (1988). Class III gaming is de-

fined as "all forms of gaming that are not class I gaming or class II gaming." 25 U.S.C. § 2703(8). Class III gaming generally includes "slot machines, casino games including banking card games, horse and dog racing, pari-mutuel, jai-alai, and so forth." S. Rep. No. 100-446, 100th Cong., 2nd Sess. 5 (1988), *reprinted in* 1988 U.S. Code Cong. & Ad. News 3071, 3073. Banking card games are those games in which the players play against the house and the house acts as banker; non-banking card games are those in which players play against each other. 1988 U.S. Code Cong. & Ad. News at 3079. Class III games may be operated on Indian lands in states that permit such gaming activities and are to be regulated pursuant to a tribal-state compact. 25 U.S.C. § 2710(d)(1), (3). Under the provisions of the IGRA, Indian tribes are allowed to conduct casino-type gambling on Indian lands only if "located in a State that permits such gaming for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(d)(1)(B).

On July 10, 1992, we held that the Governor had the authority to enter into negotiations with the Kickapoo Nation, but, in the absence of an appropriate delegation of power by the Kansas Legislature or legislative approval of the compact, the Governor had no power to bind the State to the terms thereof. *State ex rel. Stephan v. Finney*, 251 Kan. 559, 583, 836 P.2d 1169 (1992) (*Finney I*). On March 4, 1993, the Kansas Tribal-State Gaming Compact Act (KTSGCA) was enacted into law. The KTSGCA established the procedures for negotiating tribal gaming compacts with the State. On March 30, 1993, Senate Resolution 1844 required the Attorney General to bring an action to determine the Governor's authority to negotiate compacts authorizing casino gambling and other Class III gaming on Indian lands in light of the gaming prohibitions contained in the Kansas Constitution and Kansas statutes.

On March 31, 1993, pursuant to the KTSGCA, Governor Joan Finney submitted to the Joint Committee on Gaming Compacts two proposed compacts between the State of Kansas and (1) the Prairie Band of Potawatomi Indians and (2) the Kickapoo Nation. The compacts provide for a wide range of casino-type gambling, including blackjack, poker, roulette, and keno. On March 31, 1993, pursuant to the KTSGCA, the proposed tribal-state compacts were submitted to the House and Senate of the Kansas

Legislature. On April 2, 1993, the Senate voted to reject both compacts, reasoning, in part, that approval would be premature absent a judicial determination of the issues raised in S. Res. 1844.

On April 15, 1993, the Attorney General filed this mandamus and quo warranto action. Respondent caused the action to be removed to federal court. Upon hearing, the United States District Court found that because the petitioner's claims for relief could be resolved without deciding or addressing a substantial issue of federal law, the petition does not arise under federal law. The federal court then remanded the case to this court.

At oral argument, counsel for respondent made two challenges to the jurisdiction of this court to hear the matter. Respondent first claims that "whether Kansas is a state subject to the provisions of the Indian Act" had already been decided in *Finney I*. Petitioner claims that respondent misconstrues the primary issue of the present case and that "whether Kansas is a state subject to the provisions of the Indian Act" is a federal question which only the federal courts have jurisdiction to determine. We agree with petitioner that this is a question for the federal courts to consider. We need not discuss this challenge further.

Respondent then asserts that the primary issue is whether Kansas is subject to the provisions of the IGRA as to Class III gaming. Respondent points out that the federal court which remanded this action to this court had jurisdiction to decide that issue. Petitioner notes that by contending that the IGRA controls this decision, respondent is repeating an earlier argument to support removal of the action to federal court. Petitioner also points out that respondent's assertion ignores the fact that after respondent removed this action to the federal courts, the case was remanded to the Kansas Supreme Court by the federal district court because the primary question required an interpretation of the Kansas Constitution.

The Kansas Supreme Court is the proper forum to decide the State constitutional issues raised by the petitioner. Respondent's claim that this court is without jurisdiction has no merit.

I. WHAT IS A LOTTERY AS THAT TERM IS USED IN ART. 15, § 3 OF THE KANSAS CONSTITUTION?

Art. 15, § 3 of the Kansas Constitution provides:

"**Lotteries.** Lotteries and the sale of lottery Lotteries Lotteries tickets are forever prohibited."

This provision was adopted as part of the Kansas Constitution by the Wyandotte Convention in July 1859 and ratified by the electors later that year.

### Judicial Branch Interpretation

Since 1891, the Kansas Supreme Court has defined lottery in examining entrepreneurial attempts to circumvent the constitutional ban on lotteries. In *State ex rel. v. Mercantile Association*, 45 Kan. 351, 25 Pac. 984 (1891), the Attorney General sought to forfeit the charter of the Kansas Mercantile Association, which was conducting a business known as "playing policy." Under the arrangement, a person, for an investment of from five cents to one dollar, would purchase a "vendor's certificate." The certificate entitled the buyer to a lead pencil and the selection of three numbers. The numbers were handed in to the association's offices. A drawing was held twice a day on the stage of Hanson's Opera House in Kansas City. There, 78 numbers were placed inside a wheel, which was then spun for 30 minutes. A blindfolded boy would withdraw 12 numbers at a noon drawing and 13 numbers during the evening drawing. The numbers were posted on a blackboard and were sent to association offices in Atchison, Wichita, Leavenworth, and several out-of-state locations. If a purchaser's three numbers had been drawn, the purchaser would win a prize ranging from 45 cents to $2,500.

We construed the word lottery "in the popular sense, with a view of remedying the mischief intended to be prevented." 45 Kan. at 353. Examining cases from other jurisdictions which found such activities as a gift sale of books, prize concerts, prize tickets which included a newspaper subscription, and raffles to be lotteries, we found the reasoning in a New York case, *Wilkinson v. Gill*, 74 N.Y. 63 (1878), dispositive. New York had a statute outlawing lotteries. In *Wilkinson*, a similar scheme, also called "playing policy," was challenged. The New York appellate court reasoned:

"The word 'lottery' has no technical legal meaning. . . . It is defined by Webster, 'a scheme for the distribution of prizes by chance, or the distri-

bution itself,' and he defines 'lot' as 'that which causes, falls or happens; that which in human speech is called chance, fortune, hazard,' and 'to draw lots' is 'to determine an event by drawing one thing from a number, whose marks are concealed from the drawer, and thus determining an event.' Worcester defines 'lottery' as 'a hazard in which sums are ventured for a chance of obtaining a greater value.' The language of FOLGER, J., in 56 N.Y. 424 [1874], may be adopted as a result of the accepted definitions. 'Where a pecuniary consideration is paid, and it is determined by lot or chance, according to some scheme held out by the public, what and how much he who pays the money is to have for it, that is a lottery.' " 74 N.Y. at 66.

Relying on *Wilkinson*, we declared the association's charter null and void after concluding that the association's business was "a scheme for the distribution of prizes by chance," and that a purchaser did so "to try his luck at 'fortune's wheel,' and not to get a lead pencil." 45 Kan. at 355.

In *In re Smith, Petitioner*, 54 Kan. 702, 39 Pac. 707 (1895), Smith was arrested for operating a lottery in Wyandotte County. He sought release on a writ of habeas corpus, contending that since there was no statute making the operation of a lottery a crime, he should be released. We rejected this argument, finding that he was charged under a statute which made punishable, by fine or imprisonment, engaging "in any unlawful calling whatever." 54 Kan. at 706. In so doing, we reinforced the constitutional prohibition against lotteries and defined a lottery as "a hazard in which sums are ventured for a chance at obtaining a greater value." 54 Kan. at 707.

In *Davenport v. City of Ottawa*, 54 Kan. 711, 39 Pac. 708 (1895), defendant was a partner in an Ottawa dry goods store. To stimulate business, Davenport put a small box containing $25 in the store window along with a sign stating that anyone who purchased at least 50 cents worth of goods would be given a key which might unlock the box. If it did, the money belonged to that purchaser. Keys would be tried in the box approximately two months after the box was placed in the window. Davenport was arrested and charged with violating Ottawa city ordinances prohibiting the sale of lottery tickets and running a gambling house. He was found guilty and appealed, contending his enterprise was not a lottery because the element of consideration was lacking. We disagreed, reasoning that when a purchaser bought

goods during this period, the purchaser was also purchasing a chance to win the money in the box. 54 Kan. at 717. We found no distinction between this case and *Mercantile*. 54 Kan. at 718.

In *State, ex rel., v. Fox Kansas Theatre Co.*, 144 Kan. 687, 62 P.2d 929 (1936), defendant implemented a "bank night" as an advertising means of increasing theater ticket sales. The theater deposited a certain amount of money in a bank account. Anyone 16 years or older was permitted to register to win the money, whether buying a theater ticket or not. Each registered person was assigned a number. On the designated "bank night," the numbers were put in a box, from which the winning number was selected. The Attorney General brought a quo warranto action to enjoin the theater, contending that "bank night" was a lottery. Both parties argued that the three necessary elements in a lottery were a prize, a chance, and a consideration. Defendant argued "bank night" was not a lottery, reasoning that since the purchase of a theater ticket was not required to register to win, the element of consideration was lacking. We disagreed, finding that the increased ticket revenue generated by bank nights was sufficient consideration coming directly or indirectly from those entitled to the chances. 144 Kan. at 700. We held:

> "The 'bank night' theater plan as set out in the answer of the defendant in this quo warranto action, and copied in the opinion, is held to include the three necessary elements of prize, chance and consideration, sufficient to make it a policy or scheme of drawing in the nature of a lottery as prohibited by article 15, section 3, of the constitution of the state of Kansas, and as described and defined in R.S. 21-1501." 144 Kan. 687, Syl. ¶ 1.

In *State v. Brown*, 173 Kan. 166, 244 P.2d 1190 (1952), Brown was charged with violating G.S. 1949, 21-1502, which prohibited the possession or sale of a lottery, or similar, ticket. Brown had 823 punchboards in his possession and had sold punchboard tickets. Brown contended that the punchboard was not a lottery ticket. We rejected this argument, labeling it a "distinction without a difference." 173 Kan. at 169. Reviewing the earlier *Mercantile, Davenport*, and *Fox Theatre* cases, we found "little difficulty in concluding that the punchboards described in the information are gambling devices and/or schemes designed for the distribution of prizes by chance and hence, within the mean-

ing of that term as used in our constitution and statutes, must be regarded as 'lotteries' per se." 173 Kan. at 169.

In *State, ex rel., v. Bissing,* 178 Kan. 111, 283 P.2d 418 (1955), the challenge to lotteries arose from parimutuel betting on greyhound races in Sedgwick County. G.S. 1949, 21-1510 permitted wagering on races two weeks each year. The Sedgwick County Attorney sought to enjoin the operation as violating the art. 15, § 3 prohibition against lotteries. Bissing, the race track operator, contended that the operation did not constitute a lottery or the sale of lottery tickets and that the statute permitted wagering two weeks during the year. The trial court adopted Bissing's theory and denied an injunction for the remainder of the two-week wagering period, but enjoined the operations for the remainder of the calendar year. The State appealed the denial of the injunction.

We reversed. First, we reviewed learned treatises on lotteries, finding that authorities agreed that the essential elements and ingredients of a lottery are: (1) consideration, (2) prize, and (3) chance. 178 Kan. at 117. Next, we referred to the statutory definition of a lottery contained in G.S. 1949, 21-1506:

"The term 'lottery,' as used in this act, includes schemes for the distribution of money or property among persons who have given or agreed to give a valuable consideration for the chance, whether called a lottery, raffle, or gift enterprise, or by some other name." 178 Kan. at 117.

Citing the public policy of Kansas prohibiting lotteries and the former cases involving attempts to circumvent the prohibition, we reasoned that "an undertaking whereby persons pay a *consideration for the chance* to receive *money or property* constitutes a *lottery*." 178 Kan. at 118. (Emphasis in original.) We therefore held that parimutuel betting on dog races constituted a lottery and the sale of lottery tickets. 178 Kan. 111, Syl. ¶ 4.

In *State ex rel. v. Highwood Service, Inc.,* 205 Kan. 821, 473 P.2d 97 (1970), we determined that tuning in a giveaway television program was not consideration; therefore, the game was not a lottery. Highwood Service, Inc., owned a Topeka television station which intended to broadcast a program called "Dialing For Dollars." The program involved cutting sections of local telephone directories into segments containing 20 names, placing them in a rotating cage, drawing one slip at random, selecting one name

from the slip, and telephoning that person. If the person called knew a predesignated code number and the amount in the jackpot, the person won. The code number and jackpot could be determined from watching the programs. If the person telephoned answered incorrectly, or was not reached, that person received a prize of one dollar. The program was designed to increase the viewing audience for advertising purposes. The Attorney General sought to enjoin the program, contending it was a lottery. The trial court ruled that the program was not a lottery within the meaning of K.S.A. 21-1501 (Corrick). The State appealed. The parties agreed that the elements of prize and chance were present in the program. However, they differed with respect to the element of consideration, with the defendant asserting that element was lacking. Distinguishing the *Fox Theatre* "bank night" case for requiring some overt act of participation, such as registering to win, we found:

"What does, and what does not, provide the consideration necessary to the operation of a lottery has been the subject of much judicial verbiage to which, at this time, we shall not add materially. It is sufficient here to observe that, in our opinion, the bounds of reason would be exceeded were we to say that the requirement of consideration has been fully met whenever a TV fan turns the dial of his machine to Dialing for Dollars and then relaxes in his easy chair awaiting the call which he hopes will bring him fortune." 205 Kan. at 823.

After a brief review of the constitutional prohibition against lotteries, and of lottery definitions, we concluded that in 1859, when the constitution was adopted, and in recent years as well, the common understanding of a lottery included a "consideration of value" which did not encompass the act of tuning in a giveaway television program in one's home. 205 Kan. at 826-27.

In 1969, the Kansas Legislature, in establishing a Kansas Criminal Code, revised the laws of this state concerning gambling. See L. 1969, ch. 180. The former statutes, including K.S.A. 21-1501 through 21-1506 (Corrick), prohibited specific activities such as lotteries. The new statutes defined prohibited conduct generally.

The 1971 Kansas Legislature created a "bingo" exception to the definition of gambling. L. 1971, ch. 111, § 1. Codified as K.S.A. 1971 Supp. 21-4302, the amendment defined, in subsec-

tion (2), a lottery as an enterprise "wherein for a consideration the participants are given an opportunity to win a prize, the award of which is determined by chance." Subsection (3) excluded as "consideration" money paid to participate "in any bingo game or a game of chance with comparable characteristics."

In *State v. Nelson*, 210 Kan. 439, 502 P.2d 841 (1972), the bingo exception was challenged. At a gambling raid at the American Legion Club in Iola, agents from the Attorney General's office saw two patrons in close proximity to five slot machines. They were charged with gambling; the acting club manager was charged with possession of a gambling device. The trial court held as a matter of law that no crime had been committed because of the bingo exception in K.S.A. 1971 Supp. 21-4302. The State appealed. The issue on appeal was whether the phrase "bingo and games of comparable characteristics" included slot machines. We began our discussion by deciding that the issue could not be decided without considering and discussing the elements of a lottery, and, in so doing, making a determination of the constitutionality of the bingo law. 210 Kan. at 443.

Justice Owsley's well-reasoned opinion for the court, striking down the bingo law as unconstitutional, is worth repeating, for it summarizes the history of art. 15, § 3 and its underlying principles:

"Article 15, section 3 of the Kansas Constitution provides: 'Lotteries and the sale of lottery tickets are forever prohibited.'

"Although this constitutional provision was undoubtedly borrowed from states previously admitted to statehood, it is apparent that the framers of the constitution of this state conscientiously determined that prohibiting lotteries forever was a method of promoting a sound basis for the welfare and growth of this state. Since its adoption, many efforts have been made by persons and organizations to circumvent this constitutional provision. Such efforts have generally been made for profit, seeking to elicit money from those who cannot refrain from the instinctive weakness of humanity to gamble.

"This court has steadfastly adhered to the constitutional provision by striking down such efforts. (*The State ex rel. v. Mercantile Association*, 45 Kan. 351, 25 Pac. 984, [distribution of prizes by chance]; *In re Smith, Petitioner*, 54 Kan. 702, 39 Pac. 707, [sale of lottery tickets]; *The State, ex rel., v. Fair Association*, 89 Kan. 238, 131 Pac. 626, [bets on horse races]; *State, ex rel., v. Fox Kansas Theatre Co.*, 144 Kan. 687, 62 P.2d 929, [theater bank night]; *City of Wichita v. Stevens*, 167 Kan. 408, 207 P.2d

386, [punchboards]; *State v. Brown*, 173 Kan. 166, 244 P.2d 1190, [punchboards]; *State, ex rel., v. Bissing*, 178 Kan. 111, 283 P.2d 418, [parimutuel betting on dog races].)

"It has been firmly established from these cases as the law of this state that a lottery has three essential elements; namely, (1) consideration, (2) prize, and (3) chance.

"In *State, ex rel., v. Highwood Service, Inc.*, 205 Kan. 821, 473 P.2d 97, we held that the turning of a dial of a television set to a certain program which awarded prizes did not constitute 'consideration' within the meaning of K.S.A. 21-1501 (repealed L. 1969, ch. 180) and Article 15, section 3 of the Kansas Constitution. We also stated at page 825:

'But while the constitutional ban against lotteries may be self-executing, it is not self-defining. That function is judicial in nature, devolving upon the courts. . . .'

"The essential difference between a constitution and a statute is that a constitution usually states general principles or policies, and establishes a foundation of law and government, whereas a statute must provide the details of the subject of the statute. A constitution, unlike a statute, is intended not merely to meet existing conditions, but to govern future contingencies.

"Although a constitution is usually a declaration of principles of fundamental law, many of its provisions being only commands to the legislature to enact laws to carry out the purposes of the framers of the constitution, it is entirely within the power of those who establish and adopt the constitution to make any of its provisions self-executing. Our constitution put a ban on lotteries and the sale of lottery tickets in plain, unambiguous terms and emphasized the intent of the framers by the use of the language 'shall be forever prohibited in this state.' Prohibitory provisions in a constitution are self-executing to the extent that anything done in violation of them is void.

"It is the function and duty of this court to define constitutional provisions. The definition should achieve a consistency so that it shall not be taken to mean one thing at one time and another thing at another time. It is the nature of the judicial process that the construction becomes equally as controlling upon the legislature of the state as the provisions of the constitution itself. (16 C.J.S. Constitutional Law, § 13.) Any attempt by the legislature to obliterate the constitution so construed by the court is unconstitutional legislation and void. Whenever the legislature enacts laws prohibited by judicially construed constitutional provisions, it is the duty of the courts to strike down such laws.

"The legislature, by enacting the statutes in question, attempted to declare that 'consideration' shall not include money paid to participate in a bingo game. The legislature, in effect, sought to remove 'consideration' as one of the elements of a lottery. In so doing, the legislature exceeded its constitutional power. The constitution must be interpreted and given effect as the paramount law of the state, according to the spirit and intent of its framers. A legislative enactment in evasion of the terms of the constitution,

as properly interpreted by the courts and frustrating its general and clearly expressed or necessarily implied purpose, is clearly void.

"The fact that the statute prohibits a profit to any private shareholder, member or employee of an organization exempt from tax, does not create immunity for an enterprise which violates the provisions of the constitution. We cannot insert into our constitution an exception that the framers failed to make. Their reasoning could have been in accord with *Harriman Institute of Social R. v. Carrie Tingley C. C. Hospital*, 43 N.M. 1, 84 P.2d 1088 (1938), which said:

'Now the gambling spirit feeds itself with as much relish upon a charity lottery as upon any other kind. If the average person be consumed with a desire to take a chance and get something for nothing, it matters not to him whether the promoter makes a profit or that the profit goes to charity. Indeed, if it does go to charity, his participation wears a cloak of piety otherwise denied it. He thus may be persuaded to purchase tickets oftener and in larger volume because operated in the name of charity or religion. The point we seek to make is that widespread participation in a charity lottery is just as baneful in its effect upon the public as widespread participation in any other kind of lottery. And we think it will be conceded, indeed we feel this court has said as much, that our lottery statutes sought to prevent widespread participation in any kind of lottery.' (pp. 6, 7.)

"It is immaterial whether slot machines have 'comparable characteristics' to bingo since bingo in the context of the statutes falls before the mandate of the constitution. Statutory provisions which attempt to legalize bingo or the use and possession of slot machines are inconsistent with our constitution.

"It is not our proper function to express any opinion with respect to the moral aspects of either operators or players of bingo. We recognize that many respectable persons look upon bingo as an innocent and harmless recreation, and the benefits of bingo are frequently applied to worthwhile religious and charitable purposes.

"In view of the foregoing it is our holding that the bingo exception to the gambling laws passed by the 1971 legislature is unconstitutional and void." 210 Kan. at 444-46.

The historical thread in Kansas, then, has been from complete prohibition to the authorization and regulation of well-defined forms of gambling. It is clear that the term lottery was broadly defined in Kansas judicial decisions to encompass all forms of gambling which involve consideration, chance, and prize. Clearly, the term lottery, as used in art. 15, § 3 of the Kansas Constitution, has been defined by this court as any game, scheme, gift, enterprise, or similar contrivance wherein persons agree to give valuable consideration for the chance to win a prize or prizes. See *State ex rel. Stephan v. Finney*, 251 Kan. 559, 569, 836 P.2d 1169 (1992) (*Finney I*).

## II. DID THE ADOPTION OF ART. 15, § 3c ALTER THE BROAD DEFINITION OF LOTTERY PREVIOUSLY EXPRESSED IN KANSAS JUDICIAL DECISIONS?

In 1974, the constitution was amended by Kansas voters to permit bingo games to be conducted by bona fide nonprofit religious, charitable, fraternal, educational, and veterans organizations. Kan. Const. art. 15, § 3a. (L. 1974, ch. 461). The Senate resolution proposing the amendment did not provide an explanatory note for the voters.

In 1986, Kansas voters amended the constitution to permit parimutuel wagering in horse and dog racing and authorize the State to own and operate a lottery. Sixty-four percent of Kansas voters approved the passage of art. 15, § 3c in the November 1986 general election (515,893 for; 291,411 against).

Art. 15, § 3b, which permits parimutuel betting in horse and dog racing, provides:

"Notwithstanding the provisions of section 3 of article 15 of the constitution of the state of Kansas, the legislature may permit, regulate, license and tax, at a rate not less than 3% nor more than 6% of all money wagered, the operation or conduct, by bona fide nonprofit organizations, of horse and dog racing and parimutuel wagering thereon in any county in which: (a) A majority of the qualified electors of the county voting thereon approve this proposed amendment; or (b) the qualified electors of the county approve a proposition, by a majority vote of those voting thereon at an election held within the county, to permit such racing and wagering within the boundaries of the county. No off-track betting shall be permitted in connection with horse and dog racing permitted pursuant to this section."

The House resolution proposing this amendment included an explanatory note on the ballot that informed the voter:

"This proposed amendment would authorize the legislature to permit, license, regulate and tax horse and dog races and parimutuel wagering on such races, conducted by nonprofit organizations, in any county where a majority of the voters have approved this proposition or a later proposition authorizing the conduct of the races and wagering in their county but would prohibit off-track betting.

"A vote for the proposed amendment would permit horse and dog racing with parimutuel wagering in any county where a majority of the voters approve this proposition or a later proposition authorizing the conduct of the races and wagering in their county but would prohibit off-track betting.

"A vote against the proposed amendment would continue the current prohibition against parimutuel wagering on horse and dog races." L. 1986, ch. 416, § 2.

Art. 15, § 3c, which permits a state-owned lottery, provides:

"Notwithstanding the provisions of section 3 of article 15 of the constitution of the state of Kansas, the legislature may provide for a state-owned and operated lottery, except that such state-owned lottery shall not be operated after June 30, 1990, unless authorized to be operated after such date by a concurrent resolution approved by a majority of all of the members elected (or appointed) and qualified of each house and adopted in the 1990 regular session of the legislature. The state shall whenever possible provide the public information on the odds of winning a prize or prizes in a lottery game."

This proposed amendment also included an explanatory statement to be printed on the voting ballot, which read:

"This proposed amendment would authorize the legislature to provide for a state-owned and operated lottery.

"A vote for the proposed amendment would permit the legislature to provide for operation of a state-owned and operated lottery until June 30, 1990, with authority for the legislature to authorize the operation of such lottery after that date by adopting a concurrent resolution by a majority vote of all members of each house during the regular session of the legislature in 1990. The legislature shall provide by law for informing the public of the odds of winning prizes in the lottery.

"A vote against the proposed amendment would continue the current prohibition against such lotteries." L. 1986, ch. 414, § 2.

Legislation was enacted after the passage of each constitutional amendment, regulating bingo (K.S.A. 79-4701 *et seq.*), allowing horse and dog racing with parimutuel betting (K.S.A. 74-8801 *et seq.*), and allowing a state-owned and operated lottery (K.S.A. 74-8701 *et seq.*).

Since 1891, we have construed the term "lottery" to include *any* act of gaming which included the elements of consideration, chance, and prize. It is presumed that the legislature acts with full knowledge as to judicial decisions on prior law. *State v. Trudell*, 243 Kan. 29, 34, 755 P.2d 511 (1988). Before 1974, Kansans did not have legalized gambling and lotteries in any form. Against this general backdrop, Kansas entrepreneurs sought devices to spur business and skirt the constitutional prohibition. Until 1974, we struck down every attempt to circumvent the constitutional ban from "playing policy" numbers (*State ex rel.*

*v. Mercantile Association*, 45 Kan. 351, 25 Pac. 984 [1891]) to theater bank nights (*State, ex rel., v. Fox Kansas Theatre Co.*, 144 Kan. 687, 62 P.2d 929 [1936]) to parimutuel betting (*State, ex rel., v. Bissing*, 178 Kan. 111, 283 P.2d 418 [1955]) to bingo and slot machines (*State v. Nelson*, 210 Kan. 439, 502 P.2d 841 [1972]). Soon after the *Nelson* decision, the Kansas voters passed the first amendment to the art. 15 prohibition against lotteries by permitting bingo games to be conducted by bona fide nonprofit organizations. Art. 15, § 3a. Since then, the constitutional prohibition has been amended twice to allow horse and dog racing, and parimutuel wagering thereon, art. 15, § 3b, and the authorization of a "state-owned and operated lottery." Art. 15, § 3c.

We have reviewed how this court has defined lottery prior to the passage of the constitutional amendment to allow state-owned lotteries. There is little evidence in the record of what the Kansas legislators and voters thought or intended when approving art. 15, § 3c to permit all forms of gambling involving consideration, chance, and prize. We will now examine how the executive and legislative branch have acted since the amendment was approved.

### The Executive Branch Interpretation

The executive branch's actions are represented by the opinions of the Attorney General. The following Attorney General opinions indicate that the executive branch's interpretation of the meaning of the term lottery as used in art. 15, § 3c includes casino gambling.

The first inquiry concerned whether § 3c allowed the State to participate in a multi-state lottery. Att'y Gen. Op. No. 87-16. The opinion stated the legislature did not intend to specifically preclude multi-state lotteries in the proposed constitutional amendment that later became § 3c. Both the legislature and the voters understood the purpose of the lottery amendment was to raise revenue and that a multi-state lottery met the revenue raising aspect of the intent of the amendment. Therefore, the Attorney General opined, "It appears that the intent of the voters in approving the lottery was to allow closely regulated gambling and to raise money for the state. A multi-state lottery would not be repugnant to the intent of the constitutional provisions."

In response to a legislator's inquiry regarding the import of the IGRA the Attorney General noted an earlier opinion by stating: "In . . . No. 87-38 we concluded that, because the term lottery has been defined broadly by the Kansas courts to include any game involving the three elements of consideration, chance and prize, and since article 15, section 3c does not limit the types of games the state may conduct, the state is constitutionally authorized to operate any game involving the three elements 'be it "lotto" or "casino gambling" '." Att'y Gen. Op. No. 91-119.

The most detailed explanation was issued by the Attorney General in February 1987, in response to a question posed by a state legislator whether the game of "lotto" was authorized under art. 15, § 3c of the Kansas Constitution. The Attorney General opined:

"The constitutional provision as voted on and passed by the Kansas electorate did not define or restrict the term 'lottery,' nor did it define or restrict itself to any specific games. The definitional responsibility of defining 'lottery' is therefore passed to the courts of this state. *State v. Nelson*, 210 Kan. 439, 445 (1972). In *Nelson*, the Court stated that '[t]he definition should achieve a consistency so that it shall not be taken to mean one thing at one time and another thing at another time.' *Id.* at 445.

"In *Higgins v. Cardinal Manufacturing Co.*, 188 Kan. 11 (1961), the Court stated that a constitution is not to be narrowly or technically construed but its language 'should be held to mean what the words imply to the common understanding of men.' This position was adopted in the later case of *State, ex rel., v. Highwood Services, Inc.*, 205 Kan. 821 (1970), when the court used resources available around the time the Kansas Constitution was adopted in 1859 to define 'lottery.' The Court wrote in *Highwood* at 825 and 826 that 'in ascertaining the meaning of constitutional provisions courts should consider what appears to have been the intendment and understanding of the people at their adoption. (See, also, *State v. Sessions*, 84 Kan. 856, 115 Pac. 641).' Thus, in defining the term 'lottery' the Court has adopted common usage definitions.

"In Highwood, the Court's research included the following:
'In Abbott's Law Dictionary, published in 1879, we have found this definition of a lottery:
"A scheme for the distribution of prizes by chance, among buyers of the chances.
"Such schemes were formerly very common, were authorized by law, and were even set on foot, in many instances, by the authorities, for raising revenue for public or benevolent purposes. In view of the ill effects of the element of gambling involved, they are now very generally made unlawful."

'Foremost among the citations appended to the text, the author has placed the following:

"A lottery is a distribution of prizes by chance or lot, where a valuable consideration is given for the chance of drawing a prize. *United States v. Olney*, 1 Abb. U.S. 275 (1868)."

'Webster's Third New International Dictionary, unabridged, (1964) conveys much the same idea as it defines lottery:

"a scheme for the distribution of prizes by lot or chance; esp.: a scheme by which prizes are distributed to the winners among those persons who have paid for a chance to win them, usu. as determined by the numbers on tickets as drawn at random (as from a lottery wheel)."

'To similar effect, see Oxford Illustrated Dictionary (1962) and The Random House Dictionary of the English Language, the Unabridged Edition (1967).'

"The court has refined the various definitions into three required elements in order to be recognized as a lottery in Kansas. 'The court has held that the essential elements of a lottery are three: (1) consideration, (2) prize, and (3) chance. (*State, ex rel. v. Bissing*, 178 Kan. 111, 283 P.2d 418).' *Highwood*, 205 Kan. at 823. Using this three element definition the court has adhered to the constitutional provision banning lotteries and struck down such efforts prior to Kan. Const. Art. 15, sec. 3c. 'The *State, ex rel. v. Mercantile Association*, 45 Kan. 351, 25 Pac. 984, [distribution of prizes by chance]; *In re Smith, Petitioner*, 54 Kan. 702, 39 Pac. 70, [sale of lottery tickets]; *The State, ex rel. v. Fair Association*, 89 Kan. 238, 131 Pac. 626, [bets on horse races]; *State, ex rel., v. Fox Kansas Theatre Co.*, 144 Kan. 687, 62 P.2d 929, [theater bank night]; *City of Wichita v. Stevens*, 167 Kan. 408, 207 P.2d 386, [punch boards]; *State v. Brown*, 173 Kan. 166, 244 P.2d 1190, [punch boards]; *State, ex rel. v. Bissing*, 178 Kan. 111, [parimutuel betting on dog races].' *Nelson*, 210 Kan. at 444.

"In considering the lottery provision, numerous individuals and state agencies advanced definitions for the term lottery. Included in the minutes were reports that 'new forms of lottery games are constantly being invented,' Minutes of the House Federal and State Affairs Committee, January 16, 1986, testimony of Ross Mills, Legislative Research Department, Attachment A., and 'there are currently several types of lottery products being played . . . weekly game or draw lottery . . . instant lottery ticket . . . online system . . . numbers game . . . pick four.' Minutes of the House Federal and State Affairs Committee, January 16, 1986, testimony of Secretary of Revenue Harley Duncan, Attachment B.

"It was further presented that some states have restricted their lottery to specific games. Minutes of the House Federal and State Affairs Committee, January 21, 1986, testimony of Patrick J. Hurley, Attachment C. The Kansas Legislature did not preclude any specific game or games with the language used in 1986 Senate Concurrent Resolution 1609, L. 1986, ch. 414.

"In Attorney General Opinion No. 87-16, this office indicated that:

'[t]he intent and understanding of both the legislature and the people seems to have been to have a government controlled lottery as a revenue

raising measure. Minutes of the House Federal and State Affairs Committee, January 21, 1986, testimony of Secretary of Revenue Harley Duncan, Attachment A.

'It appears that the intent of the voters in approving the lottery was to allow closely regulated gambling and to raise money for the state. A multi-state lottery would not be repugnant to the intent of the constitutional provisions.'

"In our judgment, the game 'lotto' would fall within the scope of the Kansas constitutional 'lottery' amendment since it is an unrestricted provision. The lottery could include both an active game and a passive game. An active game has been recognized as a lottery game in which the player takes action to determine the outcome by choosing a number or set of numbers to bet on, attempting to match the numbers later drawn. A passive game is a lottery game in which the player takes no active part in determining the outcome; the ticket sold is either a winner or a loser, and no choices of numbers are made. Minutes of the House Federal and State Affairs Committee, January 16, 1986, testimony of Secretary of Revenue Harley Duncan. Attachment B. Again, to be recognized as a lottery the three (3) essential elements must be present in either an active or passive game.

"The Kansas Supreme Court in *Highwood, supra*, came to the conclusion that:

'In short, we entertain the opinion that not only in 1859, when the constitution was adopted, and in 1895, when K.S.A. 21-1506 was enacted, but in recent years as well, the common understanding of a lottery entertained by men in general has been that a consideration of value must flow from those who participate. We gravely doubt that had the ordinary man in the streets in 1859 been able to envision the advent of television he would have characterized as a lottery the give-away program known as Dialing for Dollars.' 205 Kan. at 826.

"In keeping with the court pronouncement that the definition must remain constant and should withstand the test of time, any game, no matter the extent of player participation or the title assigned to the game, be it 'lotto' or 'casino gambling,' as long as it is state owned and operated and involves the essential elements discussed above, it would be classified as a lottery.

"It is therefore our opinion that a state-owned and operated lottery could include any game or combination of games as long as there is consideration, chance and prize involved in each game. Such a game would not be repugnant to the intent of the constitutional provision." Att'y Gen. Op. No. 87-38.

The next inquiry by the legislature was whether a constitutional amendment was, *inter alia*, required in order to prohibit casino gambling in the state. Att'y Gen. Op. No. 92-1. The Attorney General opined that a constitutional amendment was not required

and that the legislature could statutorily prohibit specific types of gaming so long as no one, including the State, could operate that type of game. The final relevant Attorney General opinion concerned whether video lottery games fell within the category of Class II gaming under the IGRA. Att'y Gen. Op. No. 92-46. The Attorney General concluded that video lottery games fell under Class III gaming as defined by the IGRA and not Class II.

The Attorney General's interpretation of the meaning of the term "lottery" as used in art. 15, § 3c is, then, any game involving the three elements of consideration, chance, and prize, and this definition includes casino gambling.

## LEGISLATIVE ACTION

Petitioner contends that the adoption of art. 15, § 3c substantially altered the broad definition of lottery previously expressed in Kansas judicial decisions. Petitioner claims that the intent of the legislature, which proposed the amendment, and the voters who approved it was not to allow every form of game involving chance, consideration, and prize. Petitioner asserts this intent to authorize and implement a very limited form of gambling known as a "lottery" is shown by the amendment's use of the term "state-owned lottery." Respondent, on the other hand, argues that the clear language of the amendment, unhindered by limitation or definitions, should prevail, despite what the legislators may have intended. Moreover, respondent contends the simultaneous passage of the parimutuel wagering and lottery amendments indicated a general desire by Kansas voters to allow Class III gaming in Kansas.

Petitioner asserts that the legislative history indicates that the legislature intended to permit only the type of lottery games played in certain states. From all the testimony for and against the proposed amendment to allow a state-owned lottery, plus the attendant publicity generated by lotteries in other states (see Minutes of House Committee on Federal and State Affairs, January 21, 1986, p. 2), we note that the discussion was unmistakably focused on the lottery proposed by the legislature and similar to those already existing in the states operating lotteries. There is no indication that during the hearings and debate the legislature

intended to define what constituted a "state-owned lottery" or attempted to limit what types of gambling the State could constitutionally own and operate.

Enabling legislation codified as the Kansas Lottery Act, K.S.A. 74-8701 *et seq.*, set the initial scope of the State lottery. K.S.A. 74-8710 provides for the adoption of rules and regulations governing the establishment and operation of the State lottery. The legislature restricted the variety of lottery games to be conducted:

"Temporary and permanent rules and regulations may include but shall not be limited to:

(a) The types of lottery games to be conducted, including but not limited to instant lottery, on-line and traditional games, but not including games on video lottery machines."

Respondent argues it does not matter what the legislators intended when passing art. 15, § 3c to permit a state-owned lottery. As authority, respondent cites *Colorado Interstate Gas Co. v. Board of Morton County Comm'rs*, 247 Kan. 654, 802 P.2d 584 (1990). *Colorado Interstate* concerned the exemption of merchants' and manufacturers' inventory from ad valorem taxation pursuant to art. 11, § 1 of the Kansas Constitution, which had been approved by Kansas voters in 1986. The issue before this court was whether stored natural gas owned by public utilities fell within the merchants' and manufacturers' inventory exemption. Despite arguments that the legislative framers of the amendment did not intend to exempt the stored natural gas of public utilities, we applied the clear language of the amendment and "what persons of common understanding would imply from the words used therein," and found that the natural gas stored by utilities was exempt. 247 Kan. at 662-63.

Respondent asserts that, like *Colorado Interstate*, in applying the clear language of the amendment and what persons of common understanding would give to the words in question, this court is bound to continue its broad interpretation of the term lottery when construing Art. 15, § 3c. We agree the respondent is correct in its analysis that *Colorado Interstate* could be the cornerstone of our decision. We also note that while the constitutional ban against lotteries may be self-executing, the amendment to the constitution, § 3c, creates an exemption which is not self-defining. Because the constitutional provision is not self-

defining, the definitional function is a function of the courts. We could also follow the sound reasoning of the Attorney General and reach the same conclusion. We choose not to follow either of these paths but instead will note the clear path the legislature has followed from 1895 to the present to determine the question.

In L. 1895, ch. 152, § 6, the legislature defined the term "lottery" to include

"schemes for the distribution of money or property, among persons who have given or agreed to give, a valuable consideration for the chance, whether called a lottery, raffle or gift enterprise, or by some other name."

This court defined lottery in 1891 in *State ex rel. v. Mercantile Association*, 45 Kan. 351, 353-54, 39 Pac. 708 (1891).

The Kansas Criminal Code enacted by the legislature now contains a broad prohibition against gambling, gambling operations, and gambling devices. See K.S.A. 21-4302 through 21-4308. "Gambling" is defined as making a bet or entering or remaining in a gambling place with intent to make a bet, to participate in a lottery, or to play a gambling device. K.S.A. 21-4303. Significantly, the legislature defined a "bet" as "a bargain in which the parties agree that, dependent upon chance, one stands to win or lose something of value." The legislature then stated, "A bet does *not* include: . . . (e) *a lottery operated by the state pursuant to the Kansas lottery act.*" (Emphasis added.) K.S.A. 21-4302(1). Furthermore, a lottery is defined as "an enterprise wherein for a consideration the participants are given an opportunity to win a prize, the award of which is determined by chance," but this definition does *not* include "*a lottery operated by the state pursuant to the Kansas lottery act.*" (Emphasis added.) K.S.A. 21-4302(2). Finally, "consideration" does not include "*sums of money paid by or for participants in any lottery operated by the state pursuant to the Kansas lottery act.*" (Emphasis added.) K.S.A. 21-4302(3)(b). The legislature clearly has indicated that gambling operated by the State pursuant to the Kansas Lottery Act is not included in the criminal prohibition against gambling.

The bills and concurrent resolutions submitted to the legislature since 1990 indicate the interpretation of art. 15, § 3c by the legislative branch is that the constitution permits the State to operate casino gambling, and a constitutional amendment is re-

quired to permit a private entity to operate casino gambling. In 1990, a concurrent resolution was proposed in the Senate to amend the constitution to allow the legislature to permit, regulate, license, and tax the operation or conduct of off-shore casino gambling on certain riverboats by private operators. S. Con. Res. 1647. This resolution died on general orders. In 1993, a concurrent resolution was proposed again to amend the constitution to allow a single casino gambling establishment to be located on or adjacent to the parimutuel racetrack operated in Kansas City, Kansas, as well as on Indian reservations. The proposed constitutional amendment would contain an explanatory statement for voters indicating a vote against the amendment "would continue the current prohibition applying to casino gaming." S. Con. Res. 1608. This resolution has been held over for the 1994 legislative session.

In 1992, three bills were introduced to amend and supplement the Kansas Lottery Act to allow the State lottery agency to operate and conduct casino gambling on excursion boats, S.B. 620, S.B. 772, and H.B. 3191. S.B. 620 and H.B. 3191 died in committee. S.B. 772 was killed on final action in the Senate. None of the bills required that the state-owned casino gambling on excursion boats bills be submitted to the voters as a constitutional amendment.

In ascertaining the meaning of a constitutional provision, the primary duty of the courts is to look to the intention of the makers and adopters of that provision. In interpreting and construing the constitutional amendment, the court must examine the language used and consider it in connection with the general surrounding facts and circumstances that cause the amendment to be submitted. A constitutional provision is not to be narrowly or technically construed, but its language should be interpreted to mean what the words imply to persons of common understanding. *State, ex rel., v. Highwood Service, Inc.*, 205 Kan. 821, Syl. ¶ 4, 473 P.2d 97 (1970). A constitution should not be interpreted in any refined or subtle sense but should be held to mean what the words imply to the common understanding of persons. *State v. Sessions*, 84 Kan. 856, Syl. ¶ 1, 115 Pac. 641 (1911). When interpreting the constitution, each word must be given due force and appropriate meaning. *Colorado Interstate Gas Co. v. Board*

*of Morton County Commr's*, 247 Kan. at 660; *State, ex rel., v. Hines*, 163 Kan. 300, 304, 182 P.2d 865 (1947).

The importance of understanding the intentions of the legislature in proposing the amendment cannot be understated. " '[T]he polestar in the construction of constitutions is the *intention* of the *makers* and *adopters*.' " *Hunt v. Eddy*, 150 Kan. 1, 5, 90 P.2d 747 (1939) (quoting 11 Am. Jur., Constitutional Law § 61). Where the purpose of the framers of constitutional provisions is clearly expressed, it will be followed by the courts.

Here, terms of such provisions are not entirely free from doubt; therefore, they must be construed as nearly as possible in consonance with the objects and purposes in contemplation at the time of their adoption, and the words employed should be given a practical interpretation which will give them effective operation and suppress the mischief at which they were aimed. *Hunt v. Eddy*, 150 Kan. 1, Syl. ¶ 3. To obtain the object and purpose contemplated at the time art. 15, § 3c was adopted, we have reviewed (1) the interpretation of the judicial branch of the term lottery in art. 15, § 3 since 1891 and (2) the Attorney General opinions.

In addition, we have noted the legislature's 1895 definition of a lottery and followed the legislative history of the statutes banning lotteries and gambling and the amendments to the constitutional prohibition of lotteries; pointed out that the explanatory statement to the proposed amendment informed the voters that a vote against the amendment would continue the current prohibition (art. 15, § 3) against such lotteries; observed that the bills introduced during legislative sessions since the approval of art. 15, § 3c to allow the State lottery agency to operate and conduct casino gambling on excursion boats follow the Attorney General opinions and do not require a constitutional amendment for passage; and, finally, noted that the legislature did not include a lottery operated by the State pursuant to the Kansas Lottery Act in the general prohibition against gambling.

Contrary to petitioner's position, a reading of the legislative history prior to and subsequent to when the constitutional amendment was enacted leaves no doubt that the legislature intended but one result: the advent of a state-owned and operated lottery, developed, organized, and operated to provide revenue and not

limited to lotteries such as those functioning in other states. A state-owned lottery, as that term is used in art. 15, § 3c of the Kansas Constitution, means any state-owned and operated game, scheme, gift, enterprise, or similar contrivance wherein a person agrees to give valuable consideration for the chance to win a prize or prizes.

Article 15, § 3c of the Kansas Constitution is not self-executing. Implementation of additional forms of state-owned and operated gambling must be enacted by the legislature.

Judgment is entered for the respondent in accordance with the opinion herein.

MCFARLAND, J., dissenting: I disagree with the majority opinion's construction of both art. 15, § 3 and art. 15, § 3c.

Since the admission of Kansas to the Union in 1861, art. 15, § 3 has provided: "Lotteries and the sale of lottery tickets are forever prohibited."

In determining what the prohibited conduct is, the applicable principles of constitutional construction must be stated. These were summarized in *Colorado Interstate Gas Co. v. Board of Morton County Comm'rs*, 247 Kan. 654, 660, 802 P.2d 584 (1990), as follows:

"In *Board of Wyandotte County Comm'rs v. Kansas Ave. Properties*, 246 Kan. 161, 786 P.2d 1141 (1990), we held:

'In ascertaining the meaning of a constitutional provision, the primary duty of the courts is to look to the intention of the makers and adopters of that provision.' Syl. ¶ 2.

'In interpreting and construing the constitutional amendment, the court must examine the language used and consider it in connection with the general surrounding facts and circumstances that cause the amendment to be submitted.' Syl. ¶ 3.

A constitutional provision is not to be narrowly or technically construed, but its language should be interpreted to mean what the words imply to men of common understanding. *State, ex rel., v. Highwood Service, Inc.*, 205 Kan. 821, Syl. ¶ 4, 473 P.2d 97 (1970). A constitution should not be interpreted in any refined or subtle sense, but should be held to mean what the words imply to the common understanding of men. *State v. Sessions*, 84 Kan. 856, Syl. ¶ 1, 115 Pac. 641 (1911). When interpreting the constitution, each word must be given due force and appropriate meaning. *State, ex rel., v. Hines*, 163 Kan. 300, 304, 182 P.2d 865 (1947)."

The importance of understanding the intentions of the makers and adopters was emphasized in *Hunt v. Eddy*, 150 Kan. 1, 90 P.2d 747 (1939), as follows:

" 'The polestar in the construction of constitutions is the intention of the makers and adopters.' (11 Am. Jur., Constitutional Law, § 61.)" Syl. ¶ 2.

"Where the purpose of the framers of constitutional provisions is clearly expressed it will be followed by the courts. Where terms of such provisions are not entirely free from doubt, they must be construed as nearly as possible in consonance with the objects and purposes in contemplation at the time of their adoption, and the words employed should be given a practical interpretation which will give them effective operation and suppress the mischief at which they were aimed." Syl. ¶ 3.

The basic scheme of lottery has remained unchanged at all times pertinent hereto. Illustrative of such definition is the following from Webster's Third New International Dictionary 1338 (1986):

"1: a scheme for the distribution of prizes by lot or chance; *esp*: a scheme by which prizes are distributed to the winners among those persons who have paid for a chance to win them usu. as determined by the numbers on tickets as drawn at random (as from a lottery wheel)—see DUTCH LOTTERY, INTEREST LOTTERY 2: the occasion of selection of prizes by lot."

An excellent discussion of the history of lotteries in America is found in Clotfelter and Cook, Selling Hope: State Lotteries in America (1989). The authors, in chapter 3, The Fall and Rise of Lotteries, document the following sequence of events. In 1566 Queen Elizabeth I chartered the first English government lottery. The Virginia Company's Jamestown settlement was, in part, financed by a lottery held in 1612. In colonial America, lotteries were a popular means of financing public projects. All the colonies had lotteries. Between 1766 and 1775, Rhode Island authorized 43 such lotteries. Construction of some of the buildings at Harvard, Yale, Princeton, and Columbia was financed by lotteries. During the Revolutionary War, lotteries were used to supply and support the troops. Lotteries were viewed as a sort of "voluntary tax" with a contingent profitable return.

Between 1790 and 1833, Pennsylvania authorized 60 lotteries to benefit most religious denominations. Increasingly, however, lotteries were run by private individuals, with a resultant increase

in abuse and fraud. Opposition to lotteries spread rapidly in the early 1800's.

In *Phalen v. Virginia*, 49 U.S. (8 How.) 163, 168, 12 L. Ed. 1030 (1850), the Court stated:

"Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the widespread pestilence of lotteries. The former are confined to a few persons and places, but the latter infests the whole community; it enters every dwelling; it reaches every class; it preys upon the hard earnings of the poor; and it plunders the ignorant and simple."

One of the interesting aspects of the *Phalen* decision is that, while concerned with the legality of Virginia's authorized lottery, no effort was made to define lottery, presumably because the term was so well understood.

Between 1833 and 1860, lotteries were abolished in all but three states. In this historical context, it is not surprising that Kansas saw fit to forever prohibit lotteries and the sale of lottery tickets. Due to the well-established nature of lotteries, prohibiting just lotteries would not wholly remedy the ills as a lottery could be held far from the borders of Kansas with its tickets being sold in Kansas. Prohibition of both lotteries and the sale of lottery tickets was, therefore, necessary. The use of the term lottery tickets is significant as other forms of gambling do not involve the sale of tickets.

The majority opinion relies on our case law to reach its conclusion that:

"[a] lottery, as that term is used in art. 15, § 3 of the Kansas Constitution, means any game, scheme, gift, enterprise, or similar contrivance wherein persons agree to give valuable consideration for the chance to win a prize or prizes." Syl. ¶ 1.

This definition could equally serve as a definition of gambling. Inherent in any gambling activity is the risking of something of lesser value for the chance to obtain something of greater value. A lottery is a form of gambling, but not all gambling involves a lottery. As Justice (now Chief Justice) Holmes stated in his dissent in *State ex rel. Schneider v. Kennedy*, 225 Kan. 13, 37, 587 P.2d 844 (1978):

"Certainly no one can argue with the statement that a saloon is a place that sells liquor. However, to say, as the majority does, that because a saloon

sells liquor, all places that sell liquor are saloons, is tantamount to saying that because chickens have feathers, all birds with feathers are chickens."

The majority opinion discusses the various cases in which art. 15, § 3 has been construed. It is important to go through those cases from a different perspective. The first such case is *State ex rel. v. Mercantile Association*, 45 Kan. 351, 25 Pac. 984 (1891). The activity in question therein was "playing policy." For the payment of money, a person received a lead pencil and the opportunity to select three numbers. Later, in another location, a drawing would be held from a wheel. If the three numbers selected were drawn, the participant won money far in excess of his or her purchase cost.

This court construed the word lottery "in the popular sense, with a view to remedying the mischief intended to be prevented." 45 Kan. at 353. In holding this was a lottery and that the lead pencil was not the object of the "purchase," this court relied on *Wilkinson v. Gill*, 74 N.Y. 63 (1878), which had invalidated a similar scheme on the basis it was a lottery. The New York court stated:

"The word 'lottery' has no technical legal meaning. . . . It is defined by Webster, 'a scheme for the distribution of prizes by chance, or the distribution itself,' and he ·defines 'lot' as 'that which causes, falls or happens; that which in human speech is called chance, fortune, hazard,' and 'to draw lots' is 'to determine an event by drawing one thing from a number, whose marks are concealed from the drawer, and thus determining an event.' Worcester defines 'lottery' as 'a hazard in which sums are ventured for a chance of obtaining a greater value.' The language of FOLGER, J., in 56 N.Y. 424 [1874], may be adopted as a result of the accepted definitions. 'Where a pecuniary consideration is paid, and it is determined by lot or chance, according to some scheme held out by the public, what and how much he who pays the money is to have for it, that is a lottery.'" 74 N.Y. at 66.

The significant aspect of *Mercantile Association* and *Wilkinson* is that both involved true lotteries. The same can be said of *State v. Brown*, 173 Kan. 166, 244 P.2d 1190 (1952); *State, ex rel., v. Fox Kansas Theatre Co.*, 144 Kan. 687, 62 P.2d 929 (1936); and *Davenport v. City of Ottawa*, 54 Kan. 711, 39 Pac. 708 (1895). There was no need in any of them to fine tune the definition of lottery or to distinguish it from other forms of gambling.

The issue in the above cases was whether the lottery scheme in question was a prohibited gambling endeavor. Without all three basic gambling elements—consideration, prize, and chance—the lottery scheme was not prohibited. Not all lottery-type operations involve gambling. For example, a drawing for a door prize is a lottery arrangement but is not gambling if no consideration is paid.

We then come to *State, ex rel., v. Bissing*, 178 Kan. 111, 283 P.2d 418 (1955), where, in my opinion, the train jumped the track. At issue was a statute which permitted parimutuel betting on greyhound races in Sedgwick County for a two-week period each year. The court held parimutuel dog racing was a lottery as it involved an undertaking whereby persons pay a consideration for the chance to receive money or property. Such a conclusion, in my opinion, was erroneous. Skill, study, and experience do not increase one's chances for winning a lottery. Lottery winning is wholly a matter of random selection—in other words, a matter of chance. It is true that a novice dog race bettor can be a winner based on pure luck, but the experienced professional has a far greater chance of winning. He or she will look over the field (usually eight dogs) and study the competition, the track records of each dog, the starting position of each dog, the condition of the track, how each dog normally runs (fast breaking vs. stretch runner, etc.), how recently each dog last raced, and innumerable other factors in making a knowledgeable estimate of the sequence in which the dogs will finish. This is a far cry from having only the hope and desire that the numbers he or she designated will be drawn out of a box or the right numbered pingpong balls will pop out of the machine. Dogs do not win races on the basis of random or chance selection. The basic elements of a lottery are absent in parimutuel betting on what are, essentially, sporting events.

The court in *Bissing* took the requirements for determining whether an activity involved gambling and made them the definition of lottery, which is only one form of gambling. This was error.

Next, chronologically, the majority cites *State, ex rel., v. Highwood Service, Inc.*, 205 Kan. 821, 473 P.2d 97 (1970), authored by Justice Fontron. At issue was whether a Dialing for Dollars

television program was a lottery. The court held it was not as no consideration was paid directly or indirectly by the participants. But for the lack of consideration, the Dialing for Dollars scheme contained the elements of a true lottery. Significantly, in discussing the art. 15, § 3 prohibition against lotteries, the court stated:

"But while the constitutional ban against lotteries may be self-executing, it is not self-defining. That function is judicial in nature, devolving upon the courts. We have heretofore had occasion to lay down general guidelines for its exercise. In *Higgins v. Cardinal Manufacturing Co.*, [188 Kan. 11, 360 P.2d 456 (1961)], we observed that a constitution is not to be narrowly or technically construed but its language 'should be held to mean what the words imply to the common understanding of men' (p. 18); that in ascertaining the meaning of constitutional provisions courts should consider what appears to have been the intendment and understanding of the people at their adoption. (See, also, *State v. Sessions*, 84 Kan. 856, 115 Pac. 641.)

"Our limited research has brought to light no lay or legal dictionary of an 1859 vintage, the year the Kansas Constitution was adopted by the Wyandotte Convention. However, in Abbott's Law Dictionary, published in 1879, (a not too distant era) we have found this definition of a lottery:

'A scheme for the distribution of prizes by chance, among buyers of the chances.

'Such schemes were formerly very common; were authorized by law, and were even set on foot, in many instances, by the authorities, for raising revenue for public or benevolent purposes. In view of the ill effects of the element of gambling involved, they are now very generally made unlawful.'

"Foremost among the citations appended to the text, the author has placed the following:

'A lottery is a distribution of prizes by chance or lot, where a valuable consideration is given for the chance of drawing a prize. United States v. Olney, 1 Abb. U.S. 275.' (1868.)

"Relying on the Abbott text, we feel justified in assuming that the common conception of a lottery about or near the time of the adoption of article 15, § 3; was much the same as it was in 1895, when the legislature enacted K.S.A. 21-1506 requiring the consideration from lottery participants to be 'valuable.' Webster's Third New International Dictionary, unabridged, (1964) conveys much the same idea as it defines lottery:

'a scheme for the distribution of prizes by lot or chance; *esp.*: a scheme by which prizes are distributed to the winners among those persons who have paid for a chance to win them, usu. as determined by the numbers on tickets as drawn at random (as from a lottery wheel).'

"To similar effect, see Oxford Illustrated Dictionary (1962) and The Random House Dictionary of the English Language, The Unabridged Edition (1967)." 205 Kan. at 825-26.

All of the lottery definitions contained in *Highwood* apply only to a true lottery, and the court concluded that such was their meaning of a lottery in 1859 when the Wyandotte Convention adopted art. 15, § 3.

This brings me to the final case cited by the majority, *State v. Nelson*, 210 Kan. 439, 502 P.2d 841 (1972). The case came before this court as follows: Criminal charges were filed against the defendants after they were caught in a gambling raid at an American Legion Club. Slot machines were present. Two defendants were charged with gambling and the third with operating a gambling establishment. At the time, K.S.A. 1971 Supp. 21-4302 exempted from criminal anti-gambling statutes any bingo game or a game of chance with comparable characteristics if operated by a tax-exempt organization. The sole issue presented was whether slot machines had comparable characteristics to bingo and, thus, were within the bingo exception. No constitutional issue was raised or argued. Over the vigorous disagreement of Justice Kaul, the majority raised, *sua sponte*, the constitutional issue of whether the bingo exemption statute was violative of art. 15, § 3. The majority, with no discussion of the intent in the adoption of art. 15, § 3, chronologically listed earlier cases and stated, "It has been firmly established from these cases as the law of this state that a lottery has three essential elements; namely, (1) consideration, (2) prize, and (3) chance." 210 Kan. at 444. On this basis, the court held bingo had all three elements and could not be exempted by statute from art. 15, § 3. Thus, whether or not slot machines had comparable characteristics as bingo really became irrelevant. Here again, the court confused the elements of gambling with the requirements of a specific form of gambling, a lottery. Under its circumstances, little precedential value should be afforded to *Nelson*. Interestingly, one of the cases cited in *Nelson* in support of its decision under art. 15, § 3 is *State, ex rel., v. Fair Association*, 89 Kan. 238, 131 Pac. 626 (1913), which was an effort to shut down a racetrack bookmaker under the anti-bookie criminal statute. The Supreme Court found such an operation was not lawful. A demurrer to the complaint was overruled on appeal. The opinion contains no reference to art. 15, § 3, although it was decided in a much closer time frame

to 1859 than was the other animal racing case, *State, ex rel., v. Bissing,* 178 Kan. 111.

In my opinion, *Bissing* is an aberrant decision, and should be overruled or, at least, criticized and not followed herein. Following *State, ex rel., v. Highwood Service, Inc.,* 205 Kan. 821, which is not inconsistent with any of the earlier cited cases when analyzed, except for *Bissing,* I would construe lottery to be what it was intended to be at the time of its adoption—a true lottery, not a synonym for gambling in general, as the majority opinion asserts.

If my position on art. 15, § 3 had been adopted by the majority, there would be no reason to discuss Issue No. 2, construction of art. 15, § 3c. However, the majority has not, so I turn to art. 15, § 3c, which provides:

"**State-owned and operated lottery.** Notwithstanding the provisions of section 3 of article 15 of the constitution of the state of Kansas, the legislature may provide for a state-owned and operated lottery, except that such state-owned lottery shall not be operated after June 30, 1990, unless authorized to be operated after such date by concurrent resolution approved by majority of all of the members elected (or appointed) and qualified of each house and adopted in the 1990 regular session of the legislature. The state shall whenever possible provide the public information on the odds of winning a prize or prizes in a lottery game."

Even with the majority's construction of art. 15, § 3, there are independent grounds for holding that § 3c applied only to a state-owned and operated lottery, which is a true lottery and, thus, like art. 15, § 3a and § 3b, is a narrow exception to the broadly defined lottery in art. 15, § 3. In determining the intent of the makers and adopters of § 3c in 1986, we are in an area of first impression, as the same has not been previously construed.

As would be expected on a controversial issue, the legislative record is extensive. Proponents and opponents were vigorous in their respective presentations. Proponents argued for it as a new source of badly needed state revenue. Opponents felt that a state-run lottery was an unacceptable way to raise state funds and presented figures that it would not raise as much money for state coffers as the proponents argued it would. Statistics from other states having experienced state-run lotteries were introduced. In determining legislative intent, it is necessary to view all of the

record objectively and not engage in "looking over a crowd and picking out your friends." *Mortier v. Town of Casey*, 154 Wis. 2d 18, 39, 452 N.W.2d 555 (1990). It can truthfully be said that there is not even a suggestion or even hint, in the vast amount of material presented on this issue, that passage of art. 15, § 3c would authorize the State to own or operate any form of gambling other than a true lottery.

Here again, Clotfelter and Cook's book Selling Hope: State Lotteries in America, assists in setting the stage. The following statistics and comments therefrom are pertinent. The book was published in 1989. Chapter 8, page 139, State Politics and the Lottery Bandwagon, begins:

"For the first six decades of the twentieth century lotteries were prohibited throughout the United States. New Hampshire broke the ice in 1963, and first New York and then the rest of the Northeast followed by the mid-1970s. During the 1980s states in every region adopted lotteries, and by 1988 two-thirds of the nation's population lived in states that were actively promoting the sale of a commodity that had been illegal twenty-five years earlier."

The authors then state, at page 150:

"In terms of the specific politics of lottery adoption, regional influence is enhanced by the fact that a lottery in one state will attract players from neighboring states. Until Indiana and Wisconsin established their own lotteries, for example, Illinois lottery outlets had numerous customers from those neighboring states; for those out-of-state players who did not want to make the trip themselves, 'runners' ensured that Illinois tickets were available in the state office buildings in Indianapolis and from certain bus drivers in Madison. Thus when one state adopts a lottery, the effect is to undercut arguments against adoption in neighboring states. Since their residents can now play (albeit inconveniently), and do, moral concerns and public interest arguments seem moot. And if state residents are going to play the lottery anyway, why should the neighboring state enjoy the benefits? Hence the dominoes begin falling in the region. Governor John Carlin of Kansas, grumbling about the new lottery in Missouri, explained his change of heart this way: 'I've never backed a lottery before. But not having one when your neighbor has one is like tying one hand behind your back.' "

Let us now look at the specific language of art. 15, § 3c which provides:

"**State-owned and operated lottery.** Notwithstanding the provisions of section 3 of article 15 of the constitution of the state of Kansas, the legislature may provide for a state-owned and operated lottery, except that such state-

owned lottery shall not be operated after June 30, 1990, unless authorized to be operated after such date by concurrent resolution approved by majority of all of the members elected (or appointed) and qualified of each house and adopted in the 1990 regular session of the legislature. The state shall whenever possible provide the public information on the odds of winning a prize or prizes in a lottery game."

(1) If lottery, as used in art. 15, § 3 was considered to be a synonym of gambling, a self-executing amendment exempting state-owned or operated gambling enterprises—a simple "art. 15, § 3 shall not apply to state-owned or operated gambling operations or games"—would accomplish the purpose, or (2) if it was intended that the State be exempted from art. 15, § 3 and that the legislature be left to determine what forms of gambling would be permitted, the proposed amendment could have so provided. Instead, § 3c provides: "Notwithstanding the provisions of section 3 of article 15 . . . the legislature may provide for a state-owned and operated lottery, except that such state-owned lottery . . . ." The amendment permits *a* lottery and refers to that one lottery as *such* lottery. Even authority to operate the one lottery would have expired in 1990 unless its operation was authorized by the concurrent resolution.

The enabling legislation, codified as the Kansas Lottery Act, K.S.A. 74-8701 *et seq.*, is totally harmonious with the construction that only true lottery games were authorized, listing as it does the types of lottery games (K.S.A. 74-8710) referred to in the majority opinion.

The majority opinion states *Colorado Interstate Gas Co. v. Board of Morton County Comm'rs*, 247 Kan. 654, 802 P.2d 584 (1990), could be the "cornerstone of our decision." I disagree therewith. In *Colorado Interstate*, we were construing a constitutional provision which exempted merchants' and manufacturers' inventory from ad valorem tax. The pipeline companies were in the business, *inter alia*, of buying and selling natural gas. During seasonal periods of slack demand, the excess would be stored for sale during peak demand times. This stored gas was held to be inventory and the pipelines were construed to be merchants as to such stored gas. This result required neither a strained construction of "merchant" or "inventory"—just ordinary meanings. In the case before us, an erroneous interpretation of art. 15, § 3

is being held to control the language of the clearly worded art. 15, § 3c, where all of its legislative history supports giving the words employed their common and ordinarily understood meanings. I would construe art. 15, § 3c to mean just what it says—the State is exempted from art. 15, § 3 only to own and operate a lottery.

A lottery is a commonly understood term. If someone walked into a room full of people and yelled he had just won $100 in the lottery, no one would interpret this to mean the speaker had just had a lucky day at the dog track, a great night playing poker or blackjack, or a lucky streak playing slot machines. Lottery is not a legal term. Its usage in art. 15, § 3c should be given its commonly understood meaning which is consistent with its entire legislative history.

My position may be summarized as follows. At the time of the adoption of art. 15, § 3 in 1859, lottery had a well-established common meaning. Participants pay for the opportunity to have a chance to win something of greater value. A participant selects his or her numbers. If these numbers are selected at a future drawing (or other random means), the holder of the ticket wins. Winning numbers may be predetermined at random in scratch-off or punchboard versions. The early cases decided by this court involved what were clearly lottery schemes. The issue was whether they had the necessary elements of gambling in them. Not all lottery-type activities involve gambling. The elements of gambling are consideration, prize, and chance. Drawings for door prizes are, for example, lottery arrangements, but are not gambling where no consideration is paid. The Dialing for Dollars scheme in the *Highwood Service, Inc.*, case, was a lottery but did not involve gambling, as the element of consideration was missing.

These cases were dealing with lottery-type operations. The question was essentially whether they were lotteries involving the elements of gambling. Other forms of gambling were not involved. *State, ex rel., v. Bissing*, 178 Kan. 111, 283 P.2d 418 (1955), came along and took the consideration, prize, and chance elements of gambling discussed in the earlier cases and applied them to decide that parimutuel dog races were lotteries. This is a gross misapplication of the earlier cases. In *State v. Nelson*, 210 Kan.

439, this error was repeated. The result of this error is that under these two cases all types of gambling became lotteries. This was not the holding of the cases relied on in these decisions. I would simply apply the term lottery to the well-established specific type of gambling that it is as shown by the common understanding in *State, ex rel., v. Highwood Service, Inc.*, 205 Kan. 821, 473 P.2d 97 (1970), and the historical material included herein.

Art. 15, § 3c should be construed to authorize just what its clear language provides—to permit the State to own and operate a lottery. To hold otherwise further compounds the error of *Bissing* and *Nelson* by carrying them over to a separate constitutional provision which is before us for the first time for judicial construction.

Before concluding, it is appropriate under the circumstances relative to how and why this action was brought to make some comments on issues 3 and 4, which the majority declined to determine. The Indian Gaming Regulatory Act (IGRA) (25 U.S.C. § 2701 *et seq.* [1988]) requires a state to negotiate if it "permits" class III gaming. Section 1175 of the older Johnson Act (15 U.S.C. § 1171 *et seq.* [1988]) prohibits gambling devices in Indian country. The IGRA waives the Johnson Act if such devices "are legal" in the State in which the Indian land is located. Determination of both "permits" and "are legal" involves consideration of a state's constitutional and statutory law. In *Citizen Band Potawatomi Indian Tribe v. Green*, 995 F.2d 179, 181 (10th Cir. 1993), the Tenth Circuit held that the importation of video lottery terminals onto Indian land violates the Johnson Act and that the IGRA does not waive application of the Johnson Act because such gambling devices are not legal in the State of Oklahoma. The determination that the gambling devices were not legal was based wholly on the Oklahoma criminal statute prohibiting gambling devices. The "permits" and "are legal" requirements are the subject of considerable federal litigation relative to other states. The majority has determined that a federal court should decide these issues as to what Kansas permits and what gambling devices are legal in the State.

## CONCLUSION

I would hold that art. 15, § 3 prohibits only lotteries and the sale of lottery tickets, and such prohibition does not include casino

gambling. Casino gambling is, however, prohibited by the Kansas criminal statutes pertaining to: gambling (K.S.A. 1993 Supp. 21-4303); commercial gambling (K.S.A. 1993 Supp. 21-4304); permitting premises to be used for commercial gambling (K.S.A. 1993 Supp. 21-4305); dealing in gambling devices (K.S.A. 1993 Supp. 21-4306); and possession of gambling devices (K.S.A. 1993 Supp. 21-4307).

Alternatively, if the terms "lotteries" and the "sale of lottery tickets" as used in art. 15, § 3 are construed to include casino gambling (as does the majority opinion), then art. 15, § 3c should be construed to be an exception to art. 15 § 3 (as are art. 15, § 3a and § 3b), which permits only a state-owned and operated lottery as that term is commonly understood and was intended by the makers of the amendment. This is consistent with the rule of construction that exceptions to a general provision are to be construed narrowly. See *National Collegiate Realty Corp. v. Board of Johnson County Comm'rs*, 236 Kan. 394, 690 P.2d 1366 (1984). Casino gambling would, therefore, be prohibited by art. 15, § 3 and the provisions of the Kansas Criminal Code stated in the preceding paragraph.

Finally, even if "lotteries" and "a lottery" as used in art. 15, § 3 and in art. 15, § 3c, respectively, are both construed broadly, as does the majority opinion, then casino gambling remains unlawful in Kansas. This result arises from the fact that art. 15, § 3c is not self-executing. The amendment states the legislature "may provide" for a state-owned and operated lottery. The enabling legislation is the Kansas Lottery Act, K.S.A. 74-8701 *et seq.* Under the Act, the State may operate only what are true lottery games. The exceptions in the Kansas Criminal Code relative to gambling which exempt the state-owned lottery activities are limited to the "lottery" operated under the Kansas Lottery Act. Thus, even if the Kansas Constitution is construed to permit the legislature to authorize the State to own and operate casino gambling, the legislature has not done so. Therefore, casino gambling is unlawful in Kansas.

HOLMES, C.J., and ABBOTT, J., join in the foregoing dissenting opinion.